No. 01-485

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 279

IN THE MATTER OF E.K., C.K., AND J.E.,

Youths in Need of Care.

APPEAL FROM: District Court of the Sixteenth Judicial District,

In and for the County of Fallon,

The Honorable Joe L. Hegel, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Richard L. Burns, Glendive, Montana (for A.K.); Lorraine A. Schneider, Schneider Law Offices, Glendive, Montana (for P.E.)

For Respondent:

Mike McGrath, Montana Attorney General, Mark W. Mattioli, Assistant Montana Attorney General, Helena, Montana; Albert R. Batterman,, Fallon County Attorney, Baker, Montana; Gary Bunke, Child Protection Unit, Miles City, Montana (for DPHHS)

Submitted on Briefs: November 8, 2001
Decided: December 19, 2001

Filed:

_____

Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 The natural father of E.K. and C.K. (A.K.), and the natural father of J.E. (P.E.), appeal the termination of their parental rights and grant of permanent custody of E.K., C.K., and J. E. to the Department of Public Health and Human Services by the Sixteenth Judicial District Court, Fallon County.

¶2 The sole issue on appeal is whether the District Court abused its discretion in terminating the fathers' parental rights. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 This case involves three siblings with the same birth mother, but two different fathers. The mother, (Jackie) is not appealing the District Court's termination of her rights. The Department of Public Health and Human Services (Department) removed the children from their home in May of 1999, when E.K. was ten, C.K. was nearly six, and J.E. was three and a half. At the time, Jackie was married to P.E., the father of J.E. Before addressing the Department's involvement, we review the parents' background.

¶4 Jackie's first marriage was to A.K. in 1978. They had four children, including E.K. and C.K., the youngest. While married to Jackie, A.K. drove charter and school buses which took him away from home on overnight trips. In the Spring of 1994, the Department became involved with Jackie and A.K.'s children due to the poor conditions of the home. A.K. testified that he was not living with Jackie at the time, as they were separated, but that he was aware of the problems and why the Department became involved with his children. A.K. testified he was subject to a treatment plan in 1994 when the Department had temporary custody of his children. A.K. admitted that during E.K. and C.K.'s early years, when A.K. lived with them, he "did not monitor the home environment close enough for them." In addition, A.K. told the court he knew Jackie drank alcohol, and that it was possible that he overlooked a lot of things that were going on in his home while he was married to her. A.K. also admitted that while he was married to Jackie, he physically abused her by grabbing her throat during an argument. A.K. and Jackie separated in 1994

and divorced in 1996.

¶5 Jackie married P.E. in 1996 and they have one child together (J.E.). C.K. and E.K., and later J.E., lived with Jackie and P.E. P.E. worked as a long-haul truck driver and was away for three or four weeks at a time, returning home for a day or two before leaving again. P.E. sent money home to Jackie to cover the bills; however, P.E. testified the bills were not always paid, and in fact the power was shut off a couple of times. P.E. told the court that his rifle and camcorder were missing and he assumed they had been sold or pawned. P.E. testified that if he returned home and Jackie was not there, when he asked the children where she was, they sometimes replied, "What do you think?," which P.E. understood to mean Jackie was at the bar, drinking. P.E. told the court he was comfortable leaving the children with Jackie, even though he admitted she would leave them alone or with their older sister and go to a bar. P.E. testified that he remembers Jackie as having to be under the influence to have any communication with him. P.E. and Jackie were still married in May of 1999 when E.K., C.K. and J.E. were removed, but they divorced in November of 2000.

¶6 In the thirteen months prior to removing E.K., C.K., and J.E., the Department received eleven separate referrals regarding the children. The referrals concerned extremely poor hygiene, an unsanitary home environment, inadequate clothing for cold weather, tardiness to school, exposure to pornography in the home, and abnormal sexual behavior in school. There were also reports that Jackie was often inebriated and absent from the home and her children. On May 13, 1999, the District Court found the children to be abused and neglected.

¶7 On June 1, 1999, the District Court adjudicated the children as youths in need of care within the meaning of § 41-3-102, MCA. One week later, A.K., P.E., and Jackie executed a stipulation consenting to temporary investigative authority and temporary custody. At that hearing on June 8, 1999, the District Court explained the process of temporary custody as well as implementation of treatment plans to all three parents, and warned them that failure to follow the treatment plans may result in the children being permanently placed elsewhere. The District Court also addressed visitation between the fathers and their children, advising A.K. and P.E. that they should contact the Department for visitation arrangements. At that time, a social worker for the Department, Natalie Adorni (Adorni) informed the court that she told the fathers the Department encouraged visitation, but it would have to be initiated by P.E. and A.K.

¶8 Adorni prepared treatment plans for all three parents, which the court approved on July 16, 1999. The long range goals included helping the parents to stabilize their environment and assess their strengths and weaknesses as parents, as well as determining if the parents had the ability and skills required to effectively parent their children. The treatment plans required both fathers complete the following tasks: obtain psychological and chemical dependency evaluations and follow all recommendations; not be involved in any illegal activities; participate in home-based parenting classes; maintain contact (at least twice a month) with the assigned social worker; maintain an adequate home with heat, electricity, and running water, and consistently keep the home in an acceptable manner; maintain and honor Department approved visitation contact with children; provide a safe and consistent home environment for children; and fully cooperate with all services and agencies. The time frame for accomplishing the specified treatment plan tasks was six months from the date of removal, thus ending November 2, 1999.

¶9 The Department filed for an extension of the temporary investigative authority on November 24, 1999. Following a series of motions to continue by the parties, the District Court held a hearing on February 8, 2000. At that hearing, the court asked A.K. if he had requested any visitations with his children and A.K. replied that he had not, but added he did want to visit them. The court asked P.E. about his visitation, and P.E. responded that he and Jackie had "[a] little bit at first," but contact was later suspended. Adorni explained this was in response to the clinical psychologist's opinion in the Fall of 1999, that it was becoming emotionally damaging for the children to maintain contact with Jackie.

¶10 At this February 2000 hearing, Adorni informed the court that neither father had followed through with his treatment plan. The court determined P.E. signed his treatment plan on June 24, 1999, and Adorni informed the court that on January 3, 2000, P.E. told her that "he had no intention of working a court-ordered treatment plan because the children were removed while he was not in the home."

¶11 A.K. informed the court he had not received a treatment plan. The court determined A.K. had not signed the treatment plan, and provided him a copy at the end of the hearing. However, in an affidavit, A.K. later admitted that P.E. had delivered a copy of the treatment plan to A.K., and that A.K. put it under the counter. A.K. admitted he did not open the envelope. Also in an affidavit, the County Clerk stated she sent A.K. a copy of his treatment plan on July 6, 1999, and did not receive the envelope back as undeliverable. A.K. claims the clerk mailed the envelope to the wrong address.

¶12 The District Court continued the February 8, 2000 hearing to March 9, 2000, to allow testimony from a clinical psychologist. Jackie and A.K. were present with counsel at the continued hearing, but P.E. did not appear. Jackie's counsel and Adorni both relayed to the court that P.E. did not object to continuing the temporary legal custody, and that P.E.'s counsel indicated to them that P.E.'s presence at this hearing was not necessary.

¶13 The court heard testimony from Dr. Ned Tranel (Tranel), a clinical psychologist, who evaluated Jackie and the three children. Tranel testified that all three children have a developmental disorder called Reactive Attachment Disorder (RAD) which was generated from pathogenic environmental parenting influences (i.e, gross neglect), rather than neurological influences. According to Tranel, RAD is caused by a lack of attachment or bonding between a parent and child. RAD disrupts developmental patterns of academic readiness, intellectual ability, and social skills, and can be a lifelong handicapping condition if not ameliorated during the children's formative years.

¶14 At the end of the hearing, A.K. told the court he had no objection to continuation of temporary legal custody. Adorni told the court that prior to this hearing, A.K. had not expressed an interest in working the treatment plan, nor had he requested any visitation from the Department. A.K. told the court he would like to begin contacting his children through cards and letters and progress to telephone visits. The court concluded A.K. could have monitored telephone contact.

¶15 The court relayed to the parties that based on the testimony and Tranel's report, E.K., C.K., and J.E. "need more than the average child," explaining that due to "their developmental disabilities . . . they need more stability and more safety and those types of things." The court continued, "what might have been adequate for a child without those [disabilities], might not be adequate for these children, as far as parenting skills are required." On June 1, 2000, the court granted temporary legal custody of E.K., C.K., and J. E. to the Department for a six month period.

¶16 At the end of July, 2000, A.K. moved the court to order the Department to arrange for telephone contact between A.K. and his children, E.K. and C.K. The court granted A.K.'s motion on July 31, 2000.

¶17 On September 15, 2000, the Department petitioned for permanent custody and termination of parental rights. The District Court held a termination hearing on December 12 and 13, 2000, where it heard testimony from Tranel, Adorni, the three parents, a

counselor for the children, and the children's foster mother.

¶18 At the hearing, Tranel again testified about the children's evaluation and the impact of their disabilities on their development. Tranel explained that children with RAD have difficulties getting along with peer group members, understanding and responding to nonverbal cues, and solving problems independently. Tranel testified all three children had both RAD and Attention Deficit/Hyperactivity Disorder (ADHD), which he attributed to "grossly pathological parenting during the formative years." Tranel explained that the first year to two years of a child's life are the most critical for the attachment process.

¶19 Tranel testified that Jackie suffered from chronic chemical dependency and characterized her as having a borderline personality disorder. According to Tranel, Jackie would be unable to meet a minimum standard of parenting for the three children because of the children's developmental problems combined with her chemical dependency and personality disorder. At the hearing, Jackie admitted her chemical dependency problem affected her ability to parent E.K., C.K., and J.E. When asked if she was interested in having her children returned to her, Jackie replied she was not mentally able to care for her children. Jackie also informed the court she had plead guilty to a felony (issuing bad checks, a common scheme) in January of 2000, and was on probation at the time of the December hearing.

¶20 Based on his interview with A.K. on December 6, 2000, and A.K.'s own admissions, Tranel testified that A.K. had been generally unavailable to E.K. and C.K. during their early years. Tranel noted A.K. told him that during those years, "he was not on top of everything." A.K. verified Tranel's statement when A.K. testified that he did not monitor the home environment close enough, and that he, "like most parents, blowed [sic] them [E. K. and C.K.] off for a little bit." Tranel testified that given the history of A.K.'s physical and psychological absence during the formative years, the issues of re-entry and re-bonding, the limitations of A.K.'s living conditions (four adults and a child living in a two bedroom trailer) and the special needs of the children, it would be difficult for A.K. to provide for the children's needs.

¶21 Although Tranel did not interview P.E. directly, he testified that based on the information collected from the court files and his evaluation of Jackie, P.E. had been physically and psychologically unavailable to J.E.

¶22 Tranel explained that the fathers' occupations, which required them to be gone for

long periods of time, would not necessarily cause RAD. Instead, Tranel noted contact does not have to be daily to prevent RAD, and that one way a father can contribute to the process of attachment and bonding is to love the children's mother.

¶23 According to Tranel, treating children with RAD requires providing them with a therapeutic environment that facilitates forming attachments with others, adding that such an environment must include security, structure, stability, and support. Tranel testified that in his opinion, it was in the best interests of the children that all three parents have their parental rights terminated. He also told the court it would be better for the three children to remain together.

¶24 Robyn Kuhr (Kuhr), a licensed counselor, provided therapy for the children and foster family, and also supervised telephone calls between A.K. and his two children. Kuhr testified that the conversations between A.K. and E.K. and C.K. were superficial, but in her opinion, "went well." However, the children's foster parents told Kuhr that following the phone conversations with A.K., E.K. would become more isolated and C.K. would become quite aggressive and even violent. Kuhr noted that she did not sense much of an attachment or relationship between E.K. and C.K. and their father, which in her opinion was due to the length of time between contact. Kuhr advocated permanency and as few moves as possible for the children, noting they were doing very well in their foster home. She also testified that the children should not be separated, explaining the only bonding they had experienced was with each other.

¶25 The children's foster mother, S.K., testified about the children's progress since they came to live with her family in May of 1999. S.K. testified that in her opinion E.K. and C.K. made great improvements in school and all three children have a very strong bond with each other. S.K. testified that when E.K. learned telephone contact with A.K. had been scheduled, E.K. went from being animated and happy to being emotionally flat. S.K. told the court that after contact with their father, E.K. and C.K. became very intense and aggressive. S.K. explained that following phone calls with A.K., C.K. became very aggressive and violent (i.e., screaming, trying to choke J.E. and inflict injury on S.K., and acting inappropriately with the family pet). Although J.E. did not participate in the phone calls, J.E. reacted to the older siblings, by becoming hurtful and having nightmares.

¶26 Adorni testified about all three parents' progress with their treatment plans. A.K. obtained a psychological evaluation on March 22, 2000. The evaluator found A.K. to be a "personality capable of adequate parenting," and recommended A.K. attend parenting

classes. A.K. completed a chemical dependency evaluation on April 20, 2000, which concluded A.K. did not have dependency issues. According to Adorni, A.K. failed to maintain contact with her twice a month as required under the treatment plan, noting that from August of 2000, to the December 12, 2000 hearing, A.K. contacted her twice. A.K. testified he did not have any contact with Adorni between February 2000 and August 2000. A.K. explained he left his name and number on an answering machine, but told the court when he did not hear back from Adorni he stopped leaving a message. Adorni testified that A.K. participated in six parenting classes, but not until September and November of 2000. A.K. explained to the court there were only two parenting classes offered in Helena; one in the spring and one in the fall. A.K. testified that following the July 31, 2000 order regarding telephone contact with his children, his first conversation with them was on August 17, 2000. A.K. told the court that since July, he had approximately three or four phone contacts with his children, and had written them about two or three times.

¶27 The court also heard testimony concerning P.E.'s compliance with his treatment plan. Adorni testified that up until August 30, 2000, when P.E. contacted her, P.E. had not made any effort to comply with the requirements of the treatment plan he signed June 24, 1999. P.E. testified that he knew as of May of 1999 that he had to start working on his parenting, but also told the court he felt he had done nothing wrong. P.E. eventually obtained a psychological evaluation on August 24, 2000, and a chemical evaluation on September 1, 2000. P.E. testified that he did not seek individual therapy as recommended by the doctor who evaluated him. P.E. attended a parenting class, but according to Adorni, this class did not meet the requirements under the treatment plan, which required a home-based parenting class involving a specialist who comes into the home to work with the parents. P. E. also failed to maintain contact as required by the treatment plan. Adorni testified that P. E. contacted her twice before August 30, 2000, and since August, he contacted her three times. Adorni explained that P.E.'s unwillingness to work on the treatment plan tasks until August of 2000, indicated a failure to embrace the opportunity to maintain contact with J. E. while she was in foster care, and opined that this lack of contact was detrimental to the relationship he could have formed with his child.

¶28 The District Court found A.K. failed to comply with his treatment plan since he did not complete a parenting class until November, 2000; did not maintain contact with the social worker; did not initiate contact with his children through letters; did not have significant telephonic contact with his children; and was not cooperative with the services and agencies involved in his treatment plan.

¶29 The District Court found that P.E. failed to comply with his treatment plan since he did not start working on his treatment plan until the petition for termination was filed, noting that in August of 2000, P.E. told Adorni that he was going to start working on his court-ordered treatment plan. The court also found P.E. failed to provide any documentation showing he met any of the requirements of his treatment plan, and that the parenting class he attended did not meet the requirements of the home-based parenting class required by the treatment plan.

¶30 On May 9, 2001, the District Court terminated all three parents' parental rights, and granted custody of E.K., C.K., and J.E. to the Department. A.K. and P.E. appeal the court's findings and conclusions of this order.

## STANDARD OF REVIEW

¶31 We review a district court's decision to terminate parental rights to determine whether the court abused its discretion. *In re J.W.*, 2001 MT 86, ¶ 7, 305 Mont.149, ¶ 7, 23 P.3d 916, ¶ 7 (citation omitted). We review a district court's specific findings to determine whether they are clearly erroneous. *In re J.W.*, ¶ 7. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence or if, upon reviewing the record, this Court is left with the definite and firm conviction that the district court made a mistake. *In re J.W.*, ¶ 7. In reviewing a district court's conclusions of law, we determine if they are correct. *In re S.M.,* 1999 MT 36, ¶ 15, 293 Mont. 294, ¶ 15, 975 P.2d 334, ¶ 15 (citation omitted).

¶32 We have repeatedly recognized that "a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." *In re E.W.,* 1998 MT 135, ¶ 12, 289 Mont. 190, ¶ 12, 959 P.2d 951, ¶ 12 (citation omitted). A district court must adequately address each applicable statutory requirement before terminating an individual's parental rights. *In re E.W.*, ¶ 12. The party seeking to terminate parental rights "must present clear and convincing evidence to the district court that the prerequisite statutory criteria for termination have been met." *In re E. W.*, ¶ 12 (citation omitted). In cases involving the termination of parental rights,

> clear and convincing proof is simply a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be clearly established by a preponderance of the evidence or by a clear preponderance of proof. This requirement does not call for unanswerable or conclusive evidence. The

quality of proof, to be clear and convincing, is somewhere between the rule in ordinary civil cases and the requirement of criminal procedure--that is, it must be more than a mere preponderance but not beyond a reasonable doubt.

*In re J.N., 1999 MT 64, ¶ 12, 293 Mont. 524, ¶ 12, 977 P.2d 317, ¶ 12 (citation omitted).*

¶33 In determining whether to terminate parental rights, "the district court is bound to give primary consideration to the physical, mental, and emotional conditions and needs of the children," thus "the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights." *In re J.W.*, ¶ 8 (citation omitted). We will presume that a district court's decision is correct and will not disturb it on appeal unless there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion. *In re E.W.,* ¶ 14 (citations omitted).

## DISCUSSION

¶34 Did the District Court abuse its discretion when it terminated A.K.'s and P.E.'s parental rights?

¶35 A district court may terminate a person's parental rights if it finds that the child has been adjudicated a youth in need of care, an appropriate court-approved treatment plan has not been complied with or has been unsuccessful, and the conduct or condition rendering the parent unfit is unlikely to change within a reasonable period of time. Section 41-3-609 (1)(f), MCA.

¶36 Neither A.K. nor P.E. challenge the District Court's finding that E.K., C.K., and J.E., were adjudicated youths in need of care. Nor do they challenge the appropriateness of their treatment plans. However, both fathers argue they satisfactorily completed their treatment plans and conclude the District Court's findings, that each failed to comply with his treatment plan, were clearly erroneous. In addition, they both claim there was no conduct or condition rendering them unfit that required change within a reasonable time.

¶37 The District Court found that both A.K. and P.E. neglected their children inasmuch as they had not been physically or psychologically available to their children both before and after state intervention. The court found that both fathers left their children in Jackie's "completely inadequate" care, even though they knew, or should have known, of the living

environment and lack of care the children were receiving.

¶38 While noting that part of complying with a treatment plan is to do so in a timely manner, the District Court concluded that none of the parents came close to compliance within the six month period. Further, the court concluded none of the parents were capable of providing security, stability, structure, or support for the children.

¶39 The court gave primary consideration to the physical, mental, and emotional conditions of the children in determining whether the conduct or condition of the parents rendering them unfit were likely to change in a reasonable time. The court asserted that few steps had been taken by the parents to change the conditions that caused the attachment disorder, noting that at the peak time for developing RAD (1 to 1 ½ years old), each of the fathers had a presence in the family home with the children, although not there frequently. The court further found that the extremely negative emotional disturbance following brief telephone contact underscores the finding that the children need to move on to a safe parental home.

## Termination of A.K.'s Parental Rights

¶40 The District Court found that A.K. did not comply with his treatment plan by failing to do the following: timely complete parenting classes; maintain contact with Adorni; initiate contact through letters with his children; demonstrate a willingness to cooperate with services offered. Relying on Tranel's testimony, the court noted that the special needs of the children, including the necessity of reconnecting with them, combined with A.K.'s own circumstances, made it very difficult for A.K. to parent his children. The court specifically rejected the evaluation of A.K. that found him a "personality capable of adequate parenting," noting that the evaluator was unaware of the special needs and circumstances of the children at the time of A.K.'s evaluation.

¶41 A.K. maintains there was no clear and convincing showing that he failed to complete every task of his treatment plan, and asserts he completely complied with his treatment plan in as timely a fashion as possible. A.K. further argues that it is impossible for a parent to abide to each and every detail of a treatment plan, noting for instance that parents cannot control when parenting classes will be offered.

¶42 As we have repeatedly stated, "[p]artial compliance with a treatment plan . . . is insufficient to preclude termination of parental rights." *In re K.A.B.*, 1999 MT 71, ¶ 19,

294 Mont. 29, ¶ 19, 977 P.2d 997, ¶ 19 (citation omitted). Well-intentioned efforts do not necessarily demonstrate either the completion or success of a treatment plan. *In re S.M.*, ¶ 25 (citation omitted). "[I]t is well established that a treatment plan can be unsuccessful even when the tasks were completed." *In re S.M.*, ¶ 25. We find that the fact that A.K. completed some tasks does not conflict with the District Court's finding that his compliance was insufficient.

¶43 The record clearly shows that as of February, 2000, A.K. had failed to follow through on any aspect of his treatment plan. Although there is conflicting testimony concerning when A.K. received his treatment plan, the District Court implicitly found A.K. had received his treatment plan when it found A.K. did not take the matter seriously enough to open the treatment plan P.E. delivered to him. It is not the Court's function on appeal to reweigh the conflicting evidence of record, substitute our "evaluation of the evidence for that of the trial court, or pass upon the credibility of the witnesses." *In re E.W.*, ¶ 22 (quoting *Matter of J.L.,* (1996), 277 Mont. 284, 290, 922 P.2d 459, 462. That there exists conflicting evidence of record "does not automatically preclude a finding that clear and convincing evidence to support a given position exists." *In re E.W.*, ¶ 22 (citation omitted). Thus, we will not disturb the trial court's finding that A.K. received his treatment plan prior to February 8, 2000. Moreover, the record indicates A.K. had prior experience with treatment plans and at the June 1, 1999 hearing, the court explained to A.K. and P.E. that failure to follow the treatment plans may result in termination of parental rights.

¶44 Even if we assume arguendo that A.K. received his treatment plan in February, 2000, A.K. still failed to complete the tasks within the six month window. The record clearly shows A.K. failed to maintain bi-weekly contact with Adorni, not talking to her until August of 2000, and then only contacting her twice between August and December, 2000. In addition, A.K. did not complete parenting classes until November, 2000, nearly ten months after the February hearing.

¶45 Moreover, A.K. failed to show any interest in contacting his children from the time they were removed in May, 1999, to March, 2000. When asked what action he took after the children were removed, A.K. replied that he did not know he had to do anything to help out with the children's problems after they were removed, since he "figured they were in care," and that "[i]n six months [Jackie] would get her treatment done and everything [and Jackie] would come back and she'd get the kids back."

¶46 A.K.'s failure to initiate contact with his children for nearly a year, and his subsequent

minimal contact with E.K. and C.K. from August to December, 2000, aggravated the absence of bonding between father and children. In light of A.K.'s experience with Jackie (i.e., her alcohol use and previous removal of their children) and his admission that he "blew off" his children, we conclude A.K.'s lack of interest and involvement in his children's living environment and upbringing indicate an inability to adequately care for E. K. and C.K., especially considering their special developmental needs.

¶47 We also agree with the District Court that the conduct and conditions rendering A.K. unfit were unlikely to change. In determining whether the conditions are likely to change, the court shall give primary consideration to the physical, mental, and emotional needs of the child. Section 41-3-609(3), MCA. When addressing whether a parent's conduct is unlikely to change in a reasonable time, the court must assess the past and present conduct of the parent. *In re M.A.E.*, 1999 MT 341, ¶ 37, 297 Mont. 434, ¶ 37, 991 P.2d 972, ¶ 37. We have repeatedly stated that "we do not have a crystal ball to look into to make this determination, so it must, to some extent, be based on a person's past conduct." *In re M.A. E.*, ¶ 37 (citation omitted).

¶48 The District Court gave primary consideration to the physical, mental and emotional needs of the children as mandated by § 41-3-609(3), MCA. We agree with the trial court and conclude that E.K., C.K., and J.E. need a therapeutic environment to overcome their developmental challenges, which requires security, stability, structure, and support. The children's developmental disorders stemmed from a lack of bonding and attachment to their parents. Considering A.K.'s past behavior (blowing them off) and his failure to demonstrate an ability or earnest interest in getting to know his children as evidenced by delay in addressing the treatment plan and initiating contact with E.K. and C.K., we conclude the conditions and conduct making A.K. unfit to parent are unlikely to change in a reasonable time.

¶49 Although A.K. did complete some tasks of his treatment plan, he failed to maintain contact with not only the social worker, but more importantly, his own children. There is substantial evidence to support the District Court's finding that A.K. did not comply with his treatment plan and that the conduct and conditions were unlikely to change in a reasonable time. Therefore, we conclude that the District Court did not err in terminating A.K.'s parental rights.

## *Termination of P.E.'s Parental Rights*

**¶50 P.E. argues he made substantial progress and complied with the tasks required of him under his treatment plan. P.E. also asserts the Department failed to make reasonable efforts to reunify J.E. with P.E.**

¶51 The District Court found that P.E. failed to comply with his treatment plan since he did not start working on his treatment plan until August, 2000. The court also noted P.E. provided no documentation that he had met any of the requirements of his treatment plan, and that the parenting class he attended did not meet the requirements of the home-based parenting class required by the treatment plan.

¶52 Although P.E. did eventually complete most of the tasks of his treatment plan, he did not even begin working on his parenting for nearly a year and a half after the children were removed. P.E. knew as of May, 1999 he had to start working on his treatment plan, but told the court he felt he had done nothing wrong. P.E. did not follow the recommendation of his psychological evaluation, which was to participate in individual therapy to deal with his inability to remain successfully married and to examine the effects his father's drinking had on him and his family. P.E. failed to maintain contact with Adorni, which may have contributed to P.E. participating in the wrong type of parenting class. Given the underlying basis for J.E.'s problems, lack of parental attachment and bonding, this delay indicates an unwillingness to parent his child. Further, as in A.K.'s situation, P.E.'s knowledge of Jackie's limitations as a parent (i.e., problems with alcohol, consistent absence from the home, often leaving the children unattended) and inability to manage finances (failing to pay bills and conviction for issuing bad checks), plus his awareness of unsanitary conditions in the home, indicate P.E.'s inability to parent J.E., especially considering her developmental challenges.

¶53 P.E. argues that the Department failed to assist in reunification and did not arrange visitation. However, this argument lacks merit since P.E. failed to not only keep contact with Adorni, who was in the position to offer him assistance, but also failed to even begin his treatment plan for nearly a year and a half from the time the children were removed. In May of 1999, all three parents could have had unlimited telephone contact, yet according to P.E., he participated in one telephone call to J.E. The record indicates contact between the children and Jackie was suspended following Tranel's report in the Fall of 1999, and it appears P.E.'s contact ended then as well. It is unclear from the record if P.E.'s contact was suspended by the Department. Adorni explained that the Department was unable to implement efforts to establish contact between P.E. and J.E. due to P.E.'s unwillingness to work on his treatment plan. At the February 2000 hearing, Adorni told the court she had

specifically explained to both A.K. and P.E. that the Department encouraged visitation, but before specific arrangements could be made, the fathers would have to initiate the interest to the Department. Thus it appears P.E. was not denied visitation or contact with J. E.

¶54 We also agree with the District Court that the conduct and conditions rendering P.E. unfit were unlikely to change. Just as with A.K., the District Court gave primary consideration to the physical, mental, and emotional needs of the child as mandated by § 41-3-609(3), MCA, when determining if P.E.'s conduct or condition were likely to change. The interests of the children are paramount, and as discussed above, their special needs require a therapeutic environment of security, stability, structure, and support. Considering P.E. was comfortable leaving the children with their mother, although he was aware of Jackie's problems with alcohol, her inability to pay bills, and her frequent absence from the home and children, and his failure to even begin working on a treatment plan for over a year, we agree with the District Court and conclude the conditions and conduct making P. E. unfit to parent are unlikely to change in a reasonable time.

¶55 There is substantial evidence to support the District Court's finding that P.E. did not comply with his treatment plan and that the conduct and conditions were unlikely to change in a reasonable time. Therefore, we conclude that the District Court did not err in terminating P.E.'s parental rights.

¶56 The District Court was bound to give primary consideration to the physical, mental and emotional needs of the children. Section 41-3-609(3), MCA. The children's best interests take precedence over parental rights. *In re J.W.*, ¶ 8. Both fathers were emotionally, psychologically, and physically unavailable to their children during their formative years. In addition, both fathers were aware of Jackie's limitations as a parent and excessive use of alcohol, but by not addressing any parenting issues with the children's mother, they in effect condoned the gross neglect the of children. Moreover, neither A.K. nor P.E. attempted to repair the broken bonds between them and the children. It is clear from the record that given their special developmental disabilities and needs, it was in all three children's best interests to terminate both fathers' parental rights.

¶57 Further, we note that if a child has been in foster care for fifteen out of the most recent twenty-two months, the best interests of the child are presumed to be served by termination of parental rights. Section 41-3-604(1), MCA. These children began living with their foster family on May 7, 1999, and had lived with them continuously for

nineteen months as of the hearing to terminate parental rights.

¶58 We conclude the trial court did not misapprehend the evidence concerning the fathers' compliance with the treatment plans, nor are we left with a definite and firm conviction that a mistake has been committed, thus we conclude the District Court's findings are not clearly erroneous. Therefore, we hold that the District Court did not abuse its discretion in terminating the parental rights of A.K. and P.E. We affirm.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART

/S/ JIM RICE