No. 01-800

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 174

IN THE MATTER OF

    M.T., T.T., D.T., and B.W.,

    Youths in Need of Care.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
    In and for the County of Ravalli,
    The Honorable Jeffrey H. Langton, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

    Dustin L. Gahagan, Waters & Gahagan, Hamilton, Montana

    For Respondent:

    Mike McGrath, Montana Attorney General, Ilka Becker, Assistant Montana Attorney General, Helena, Montana; George Corn, Ravalli County Attorney, Hamilton, Montana; Randall E. Lint, Corvallis Montana (DPHHS)

Submitted on Briefs:  July 11, 2002

Decided:  August 6, 2002

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 After two and a half years of intervention by the Department of Public Health and Human Services (DPHHS), and implementation of four treatment plans for A.F., the Twenty-First Judicial District Court entered an order terminating A.F.'s parental rights as to her four children, M.T., T.T., D.T., and B.W. The court concluded that M.T., T.T., D.T., and B.W., were youths in need of care, that appropriate treatment plans for A.F. had not been complied with or had not been successful, and that the conduct or condition rendering A.F. unfit was unlikely to change within a reasonable time. A.F. appeals the District Court's Findings of Fact, Conclusions of Law and Order Granting Permanent Legal Custody with the Right to Consent to Adoption. We affirm.

¶2 The sole issue presented on appeal is whether the District Court erred when it terminated the natural mother's parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On January 2, 1999, A.F.'s children, J.T.[1], M.T., T.T., D.T., and B.W., were removed from their mother's home, following a report that four of the children were home alone, with one having suffered a bad cut. DPHHS substantiated the neglect when a case worker arrived at the house to find A.F., who had returned from a bar, too intoxicated to care for the children. A.F. later stipulated to DPHHS's Petition for Temporary Investigative Authority

---

[1] Since A.F. relinquished her parental rights as to her oldest son, J.T., in February of 2001, her parental rights as to J.T., are not at issue in this appeal.

2

(TIA), which was accepted by the District Court on April 21, 1999. In that order, the District Court granted a 90-day TIA to DPHHS and also approved the first of four treatment plans for A.F., which was to be completed in 90 days.

¶4 On July 20, 1999, DPHHS petitioned for an extension of the TIA. As of that time, A.F. had successfully completed only two of the five goals listed in her first treatment plan. Following a review hearing on August 18, 1999, the District Court granted the Petition for Extension of TIA for another 90 days, and approved a second, updated, treatment plan for A.F., which A.F. was to complete in 90 days. Although reunification plans were made for August of 1999, those plans were postponed after A.F. had an argument with her husband, J.F., and left the house. A.F. was then living in her car, and could not provide adequate housing for the children. A.F. and J.F., who met at an AA meeting in the spring of 1999, reconciled shortly after the argument. J.F. is not the natural father of any of A.F.'s children.

¶5 In November of 1999, DPHHS filed for temporary legal custody. According to the attached report to the court, A.F. had failed to complete any of the six goals identified in the second treatment plan. Also during November, reunification plans were again postponed following another altercation between A.F. and her husband. A.F. signed a stipulation to temporary legal custody, and on December 15, 1999, the District Court granted temporary legal custody to DPHHS for six months, after having found the children were youths in need of care. The court also approved a third treatment plan for A.F., allowing her six months to complete the plan. This third treatment plan incorporated goals for A.F.'s husband, J.F.

3

¶6     On March 31, 2000, the social worker assigned to the case, Alicia Walker (Walker), filed a report to the court addressing the permanency plan for A.F.'s children. In her report, Walker related that A.F. and J.F. had failed to complete any of the seven goals in the third treatment plan. During the permanency plan hearing on April 5, 2000, the District Court directed A.F.'s counsel to admonish his client to abide by the conditions (i.e., treatment plan) in this matter.

¶7     On June 6, 2000, DPHHS filed for an extension of temporary legal custody, and attached another report to the court from Walker. Walker's report indicated that A.F. was able to maintain the goal of sobriety and had completed the goal of obtaining and maintaining stable housing for her children. However, A.F. had not completed four of the plan's goals (i.e., attend weekly individual therapy, attend couples therapy with J.F., attend and act appropriately at all scheduled visitation sessions and keep weekly phone contact with her children, and comply with Family Based Services). The parties filed a stipulation to extension of temporary legal custody, which the court accepted. On July 19, 2000, the court granted a six-month extension of temporary legal custody to DPHHS and also approved a fourth treatment plan for A.F. and J.F., setting a six-month completion date. During this time, DPHHS continued reunification efforts and according to a report to the court, T.T. and D.T. were returned to A.F.'s home in March of 2000, and M.T. and B.W. returned home in July of 2000.

¶8     On January 19, 2001, DPHHS filed a petition for permanent legal custody as to A.F.'s oldest child, J.T., and also petitioned for dismissal of the temporary legal custody as to the

4

remaining children, M.T., T.T., D.T., and B.W., since they had been returned to A.F.'s care. In an affidavit to the court, Walker stated that A.F. had "reduced the risk to her other four children by following and completing a treatment plan . . . ." However, in the attached report to the court, Walker stated that A.F. had "completed most of her treatment plan," listing four out of six goals as complete. Walker later told the District Court that she was "uneasy" about filing for dismissal, and explained that the reason DPHHS chose to dismiss temporary legal custody rather than pursue termination of parental rights was because, at the time, Walker thought A.F. was providing her children with the "bare minimum standards," and she felt there was not "enough evidence at that point to file for permanent legal custody, considering the kids were at home."

¶9     However, before the court ruled on the Petition to Dismiss Temporary Legal Custody, the four youngest children were again removed from the family home following A.F.'s arrest on February 26, 2001, for partner family member assault against J.F.   After this incident, DPHHS abandoned its Petition to Dismiss. On February 28, 2001, the District Court granted DPHHS permanent legal custody of J.T., to which A.F. had stipulated, and also continued temporary legal custody of M.T., T.T., D.T., and B.W.

¶10    On May 16, 2001, DPHHS petitioned the court for permanent legal custody and termination of parental rights as to the four youngest children. In the attached report to the court from Walker, she explained that near the time of A.F.'s arrest on February 26, 2001, new referrals had been made to DPHHS regarding the four youngest children, alleging neglect and exposure to unreasonable risk. The District Court held a hearing on the State's

5

Petition for Permanent Legal Custody on July 10, 2001, during which it heard testimony from Walker, Dr. Debra Ruggiero (Ruggiero), a psychologist, Kate Cremer (Cremer), a family therapist, the officer who arrested A.F. on February 26, 2001, and A.F.

¶11 Ruggiero had provided psychotherapy for M.T. and B.W., spending sixty-seven and eleven hours with each child respectively. She testified that while she had counseled two of the four children at issue in these proceedings, her opinions as to A.F.'s parenting deficiencies would apply to all the children in A.F.'s care. Ruggiero testified that in her opinion, it would be in the best interests of the children to remain in the State's permanent custody, noting that she felt A.F. could not safely parent her children. Ruggiero explained the importance of the children's sense of security, and that in her opinion, A.F. had not demonstrated the ability to provide a safe, stable, nurturing environment for the children. Ruggiero further stated she did not believe A.F. would be capable of providing such a home environment in the foreseeable future.

¶12 Cremer made the initial family assessment in this case, which included interviews with the family members as well as observations of family interactions. Cremer testified that A.F. had a history of getting involved with abusive men who had been, or were, chemically dependent on drugs and/or alcohol. This relationship history included both of the natural fathers of A.F.'s children. Cremer also explained that A.F. suffered from depression and post-traumatic stress disorder as a result of abuse she experienced during her own childhood. Cremer stated in her family assessment that A.F.'s "perception that she cannot function

6

without a man in her life is invalidated by the fact she didn't function living with the type of men she has chosen in her lifetime."

¶13    Cremer told the court that A.F. had been arrested twice for assaulting J.F., once when she threw coffee at him and then again in February of 2001.  However, based on her experience with families of domestic violence, Cremer characterized the relationship between A.F. and J.F. as one where the female is made to look like the aggressor, and opined that A.F. may have been the victim in the February, 2001 incident.  Cremer testified that she did not think J.F. had ever been arrested for assaulting A.F.

¶14    Cremer also participated in the Family Based Services (FBS) intervention that was provided for A.F. and her children.  A typical FBS intervention lasts 100 hours, and has an eighty-six percent success rate, with success being reunification of the family.  In this case, Cremer spent more than 200 hours with the family over a two year period, but testified that the main goal of the intervention, reunifying the family, was not met.  Cremer explained that A.F.'s children needed a permanent, stable home environment, or they were going to "crumble emotionally and socially [and] psychologically."   Cremer recommended terminating A.F.'s parental rights, explaining that "[o]pportunity for [A.F.] to heal her destructive pattern in a timely manner so the hurt children will receive the consistent, safe and nurturing parenting they need and deserve has been expired and it has been worn out over the past two years."  Although Cremer believed A.F. would eventually pull out of the cycle of domestic violence, she told the court the children could not be put on hold developmentally to wait for A.F. to heal from the domestic violence cycle she is in, and noted

7

it could take from five to ten years for a person suffering from intergenerational domestic violence to substantially step out of the cycle and provide stability for her children.

¶15 Walker, the social worker assigned to the family, told the court that since A.F.'s children had been removed from her home in January of 1999, M.T. and B.W. had spent twenty-four months in foster care, and approximately seven months with A.F., while T.T. and D.T. had spent twenty months in foster care, and eleven months with A.F. Since the children's removal, there had been several planned reunifications with A.F.; however, at least five or six were delayed, usually as a result of a volatile altercation between A.F. and J.F. Walker explained that A.F. consistently entered into relationships with men who were abusive, and that she and A.F. had repeatedly discussed the detrimental effect those relationships had on A.F.'s children. Walker told the court that the frequent altercations between A.F. and J.F. were very traumatizing to the children, and since those altercations typically postponed reunification plans, the children were also disillusioned.

¶16 Walker testified to at least seven volatile arguments between A.F. and J.F. between August of 1999 and February, 2001. According to Walker, A.F. considered her relationship with J.F. the healthiest relationship she had ever had. Based on A.F.'s history with men, Walker believed that it was highly likely that A.F. would continue to have relationships with abusive men. Walker added that A.F.'s inability to remove herself from a violent relationship would not likely change because A.F. had been unable to alter her lifestyle in the two-plus years DPHHS worked with her.

¶17    Walker testified that A.F. helped develop all four treatment plans and had not objected to any of the proposed treatment plan goals. All the plans included the same objective: for A.F. to provide a safe, nurturing environment for her children with successful completion resulting in reunification with her children. Walker admitted that over the twenty-plus months that A.F. worked on her treatment plans, she had made some progress, but was ultimately unable to complete the main objective of the plans. Walker testified that overall, A.F.'s treatment plans were unsuccessful, and in her opinion, A.F. could not safely parent her children, nor would she be able to in the near future.

¶18    Ruggiero, Cremer and Walker all agreed that DPHHS had implemented all the services available to it in the effort to reunify A.F. and her children. Such efforts included: individual counseling for A.F. and the children, using four different therapists, including Ruggiero; chemical dependency counseling; parenting classes; couples counseling for A.F. and J.F.; FBS intervention; and referral to Supporters of Abuse Free Environment (SAFE), a battered women's shelter providing emergency housing and counseling for women in domestic violence cycles. Walker testified that there were no other services available for A.F. to participate in, and added that even if A.F. was given additional time, no new services would come available.

¶19    In its Findings of Fact, Conclusions of Law and Order, the District Court found that while A.F. had worked over a twenty-one month period on the goals of all four treatment plans, the plans were unsuccessful. The court found that A.F. was not able to comply with the main objective of the plans, in that she was unable to demonstrate the ability to provide a

9

safe, stable, nurturing environment for her children. Based on the testimony of Ruggiero, Cremer, and Walker, the court found A.F.'s conduct and condition rendering her unfit as a parent were not likely to change within a reasonable time. The District Court also found that DPHHS had arranged for and provided A.F. with a substantial number of services, and noted DPHHS went well beyond the requirements of making reasonable efforts to provide reunification services to A.F. and her family.

¶20     Based on these and other findings, the District Court concluded that the children were youths in need of care, appropriate treatment plans had not been complied with or had not been successful, and the conduct or condition rendering A.F. unfit was unlikely to change within a reasonable time. The court ordered that A.F.'s parental rights be terminated and placed permanent custody of M.T., T.T., D.T., and B.W. with DPHHS. It is from this District Court order that A.F. appeals. Neither the natural father of M.T., T.T., and D.T., nor the natural father of B.W., appeal the District Court's termination of their parental rights.

**STANDARD OF REVIEW**

¶21     We review a district court's decision to terminate parental rights to determine whether the court abused its discretion. *In re E.K.*, 2001 MT 279, ¶ 31, 307 Mont. 328, ¶ 31, 37 P.3d 690, ¶ 31 (citing *In re J.W.*, 2001 MT 86, ¶ 7, 305 Mont. 149, ¶ 7, 23 P.3d 916, ¶ 7). We review a district court's specific findings to determine whether they are clearly erroneous. *In re E.K.*, ¶ 31 (citation omitted). A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence or if, upon

10

reviewing the record, this Court is left with the definite and firm conviction that the district court made a mistake. *In re E.K.*, ¶ 31 (citation omitted). In reviewing a district court's conclusions of law, we determine if they are correct. *In re E.K.*, ¶ 31 (citing *In re S.M.*, 1999 MT 36, ¶ 15, 293 Mont. 294, ¶ 15, 975 P.2d 334, ¶ 15).

¶22 We have repeatedly recognized that "a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." *In re E.K.*, ¶ 32 (citing *In re E.W.*, 1998 MT 135, ¶ 12, 289 Mont. 190, ¶ 12, 959 P.2d 951, ¶ 12). We will presume that a district court's decision is correct and will not disturb it on appeal unless there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion. *In re E.K.*, ¶ 33 (citation omitted).

### DISCUSSION

¶23 Did the District Court err when it terminated the natural mother's parental rights?

¶24 A district court may order termination of a parent-child legal relationship under several different circumstances, including, when the court makes a finding that the child is an adjudicated youth in need of care and both of the following exist: (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA. Before terminating an individual's parental rights, a district court must adequately address each applicable statutory requirement. *In re E.K.*, ¶ 32 (citation omitted).

11

¶25 A.F. does not challenge either the appropriateness of her four treatment plans, or the District Court's finding that M.T., T.T., D.T., and B.W., were adjudicated youths in need of care. A.F. argues that the District Court committed error when it concluded the treatment plans for A.F. were not complied with or were unsuccessful, and when it concluded the conduct or condition rendering A.F. unfit was unlikely to change within a reasonable time.

¶26 The party seeking to terminate parental rights "must present clear and convincing evidence to the district court that the prerequisite statutory criteria for termination have been met." *In re E.K.*, ¶ 32 (citing *In re E.W.*, ¶ 12). In cases involving the termination of parental rights,

> clear and convincing proof is simply a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be clearly established by a preponderance of the evidence or by a clear preponderance of proof. This requirement does not call for unanswerable or conclusive evidence. The quality of proof, to be clear and convincing, is somewhere between the rule in ordinary civil cases and the requirement of criminal procedure-that is, it must be more than a mere preponderance but not beyond a reasonable doubt.

*In re E.K.*, ¶ 32 (citing *In re J.N.*, 1999 MT 64, ¶ 12, 293 Mont. 524, ¶ 12, 977 P.2d 317, ¶ 12). In determining whether to terminate parental rights, "the district court is bound to give primary consideration to the physical, mental, and emotional conditions and needs of the children," thus "the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights." *In re E.K.*, ¶ 33 (citation omitted).

¶27 A.F. argues that the District Court's findings concerning her treatment plans as either not complied with or unsuccessful ignored the following facts: that DPHHS believed A.F. was providing for at least minimal care for her children when it petitioned for dismissal of temporary legal custody in January of 2001; Walker's statement in her January 18, 2001 affidavit accompanying the petition for dismissal, that A.F. had "reduced the risk to [M.T., T.T., D.T., and B.W.] by following and completing a treatment plan;" and that A.F. was not given a subsequent treatment plan following the February, 2001 incident. A.F. argues that by omitting these facts, the District Court erred in concluding her treatment plans were not complied with or were unsuccessful. We disagree.

¶28 The District Court made extensive findings based on the record and evidence presented during the hearing. In its findings, the District Court noted that all four treatment plans included the same main objective: for A.F. to "provide a safe, stable, nurturing environment for the children with successful completion resulting in re-unification with the children," and found that A.F. was never able to comply with this main objective. The court also specifically found that A.F. failed to complete her first three treatment plans. While the court did not make a specific finding as to A.F.'s fourth treatment plan, such a finding was implicit in the court's conclusions of law, and taken as a whole, the record provides substantial evidence that A.F. did not successfully complete any of her treatment plans, including her final plan.

¶29 On appeal, it is not this Court's function to "reweigh the conflicting evidence of record, substitute our 'evaluation of the evidence for that of the trial court, or pass upon the

13

credibility of the witnesses.' " *In re E.K.*, ¶ 43 (quoting *In re E.W.*, ¶ 22). We have repeatedly held that "partial compliance with a treatment plan is insufficient to preclude termination of parental rights." *In re E.K.*, ¶ 42 (citing *In re K.A.B.,* 1999 MT 71, ¶ 19, 294 Mont. 29, ¶ 19, 977 P.2d 997, ¶ 19). *See also, In re A.N.*, 2000 MT 35, ¶ 45, 298 Mont. 237, ¶ 45, 995 P.2d 427, ¶ 45 (claim that partial compliance with treatment plans will prevent termination of parental rights ignores the long-standing principle that partial compliance with a treatment plan is insufficient).

¶30 While A.F. correctly recites Walker's statement indicating A.F. had followed and completed a treatment plan, the record also contains evidence that A.F. failed to complete all four treatment plans, including her inability to meet the main objective of the plans. Walker's testimony and her January, 2001 report to the court, indicated A.F. had completed only four of six goals in her final treatment plan. We will not reweigh conflicting evidence or second guess the District Court's assessment of the credibility of the evidence. *See In re E.W.*, ¶ 22. Therefore, we conclude the District Court did not abuse its discretion when it concluded that A.F. did not comply with her treatment plans.

¶31 Moreover, the record also supports the court's finding that the treatment plans were unsuccessful. Section 41-3-609(1)(f)(i), MCA, is written in the disjunctive, and thus requires the district court to find that an appropriate treatment plan had <u>either</u> not been complied with <u>or</u> had not been successful (emphasis added). Also, it is well established that a treatment plan can be found unsuccessful even if it is completed. *See In re E.K.*, ¶ 42 (citing *In re S.M.*, ¶ 25); and *In re R.B.O.* (1996), 277 Mont. 272, 280, 921 P.2d 268, 273.

14

¶32 The District Court heard testimony from both experts and the case social worker that A.F.'s treatment plans were unsuccessful because A.F. failed to complete the main objective set out in each treatment plan, as more thoroughly described above. We conclude that the District Court's finding that A.F.'s treatment plans were not successful was supported by substantial evidence and was not clearly erroneous. We now consider A.F.'s argument that the District Court erred when in it concluded that the conduct or condition rendering A.F. unfit was unlikely to change within a reasonable time.

¶33 The District Court made extensive findings as to the conduct or condition rendering A.F. unfit to parent, as well as findings as to whether A.F.'s conduct or condition was likely to change in a reasonable time. Specifically, the court found that in the opinion of both experts, Ruggiero and Cremer, as well as the social worker, Walker, the conduct or conditions rendering A.F. unfit to parent were not likely to change in a reasonable time and that should the parent-child relationship continue, it would likely result in continued abuse and neglect. The court found all three witnesses were credible, compelling and persuasive. Specifically, the court found that Cremer believed that "[A.F. had] the capacity for change in the future, but that it would take [A.F.] five to ten years to correct the conditions rendering her an unfit parent." The court also found that "A.F. offered her own opinion--but no other witnesses--in support of her contention that she is able to change within a reasonable time."

¶34 Determining under § 41-3-609(1)(f)(ii), MCA, whether the conduct or condition rendering a parent unfit is likely to change within a reasonable time, "requires the court to assess the past and present conduct of the parent. As this Court has stated before, 'we do not

15

have a crystal ball to look into to make this determination, so it must, to some extent, be based on a person's past conduct.' " *In re M.A.E*, 1999 MT 341, ¶ 37, 297 Mont. 434, ¶ 37, 991 P.2d 972, ¶ 37 (citing *Matter of C.A.R.* (1984), 214 Mont. 174, 187, 693 P.2d 1214, 1221). Section 41-3-609(2), MCA, sets forth the factors a district court is to consider in entering findings relating to whether the parent's conduct or condition is likely to change within a reasonable time. Section 41-3-609(3), MCA, provides that, in considering the factors in subsection (2), "the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child[ren]." *See also, In re T.A.G.*, 2002 MT 4, ¶ 7, 308 Mont. 89, ¶ 7, 39 P.3d 686, ¶ 7.

¶35 Throughout the majority of A.F.'s involvement with DPHHS, A.F. was directed to learn how to provide a safe, stable, and nurturing environment for her children. However, A.F. repeatedly engaged in behavior that demonstrated an inability to accomplish that objective, namely, her continued violent relationship with J.F. and inability to provide a stable home environment.

¶36 We conclude that the District Court properly considered A.F.'s past and present behavior as indications of her inability to change the conduct or conditions rendering her unfit as a parent. Considering the length of time DPHHS attempted to assist A.F. in changing her lifestyle, as well as the extent of services made available to A.F. and A.F.'s consistent history of violent domestic relationships, we conclude substantial evidence supported the District Court's finding that A.F.'s violent behavior, "coupled with her choice of violent mates presents a problem of long duration and persistence that is unlikely to change within a

16

reasonable time." We further conclude that A.F.'s inability to accomplish the main objective of her treatment plans also indicated that the conduct or condition rendering A.F. unfit was not likely to change in a reasonable time. *See In re T.A.G.*, ¶ 11 (father's inability to address primary issue of chemical dependency as required under treatment plans was indication of not only lack of compliance and success of the treatment plans, but also supported the court's finding that his conduct or condition was unlikely to change in a reasonable time).

¶37 Moreover, we conclude the District Court properly considered the best interests of the children when it found that the children needed "permanency, stability, . . . and protection from exposure to chronic violence between their mother and her mate." When determining whether the conditions are likely to change, the district court shall give primary consideration to the physical, mental, and emotional needs of the child. *In re E.K.*, ¶ 47 (citing § 41-3-609(3), MCA).

¶38 We conclude that the District Court's finding that the conduct or condition rendering A.F. unfit to parent would not likely change in a reasonable time was supported by substantial evidence. We further conclude that the District Court correctly interpreted the law when it concluded that A.F.'s treatment plans were either incomplete or unsuccessful and that the condition or conduct rendering her unfit would be unlikely to change in a reasonable time. Accordingly, we hold the District Court did not abuse its discretion when it terminated A.F.'s parental rights.

¶39 We affirm.

17

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON
/S/ JIM RICE