FILED

12/29/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0350

DA 25-0350

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2025 MT 300N

---

IN THE MATTER OF:

W.B.A.,

      A Youth in Need of Care.

---

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DN-2023-66
Honorable Leslie Halligan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant Mother:

            Allen P. Lanning, Law Office of Allen P. Lanning, PC,  Great Falls,
Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Selene Koepke,
Assistant Attorney General, Helena, Montana

            Matthew Jennings, Missoula County Attorney, Ivy Garlow, Deputy
County Attorney, Missoula, Montana

---

Submitted on Briefs:  November 19, 2025

Decided:  December 29, 2025

Filed:

_____
                  Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, we decide this case by memorandum opinion. It shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 E.A. ("Mother") appeals the order of the Fourth Judicial District Court terminating her parental rights to her son W.B.A.. Mother argues that the District Court abused its discretion when it failed to consider permanent guardianship as an alternative to termination. Mother also contends that the District Court clearly erred in finding that W.B.A. suffered chronic, severe neglect and that Mother's unfit conditions were unlikely to change within a reasonable time. We affirm.

¶3 Mother's involvement with the Montana Department of Public Health and Human Services, Child and Family Services Division ("the Department") began in 2013. The Department became involved in Mother's parenting of W.B.A. when Mother tested positive for THC and alcohol while pregnant with him. At the time of W.B.A.'s birth in 2016, his half-brother, A.A., had been in the Department's care for two years.

¶4 W.B.A. remained in Mother's care but was removed in the summer of 2022, following an assault in the home and concerns about Mother's mental health and other potentially unsafe people residing in the home. The Department returned W.B.A. to Mother's care shortly before school began. The case was dismissed in November 2022. The court warned Mother that unless she focused on her mental health, chemical

dependency, and prioritizing her children, it was likely that the Department would become involved again.

¶5 Less than a year later, on May 27, 2023, the Department received a report alleging the neglect or abuse of six-year-old W.B.A.. While Mother, W.B.A., and Mother's boyfriend stayed at a hotel in Seeley Lake, Mother called law enforcement reporting that Cameron, her boyfriend, strangled her and fled through the window. As part of this investigation and after reports from W.B.A.'s school that he was not in attendance, the Department visited Mother's home on June 6, 2023. Based on the conditions of the home, W.B.A.'s statements that he felt unsafe when people he did not know were there, the statements of four or five other individuals in the home about their presence there, reports of Cameron's frequent presence and violent behavior, and Mother's escalation, the Department determined that W.B.A. was in immediate danger and it was in his best interest to be removed from the home. The Department attempted to work on a voluntary protection plan with Mother, which she refused to sign. The Department placed W.B.A. temporarily with A.A.'s paternal and W.B.A.'s fictive grandmother, A.N..

¶6 On June 12, 2023, the Department filed its Third Petition for Emergency Protective Services, Adjudication of Child as a Youth in Need of Care, and Temporary Legal Custody. Mother stipulated to show cause and later signed a written stipulation for adjudication and temporary legal custody. After Mother did not object, the court approved a treatment plan on October 3, 2023.

¶7     The treatment plan assigned Mother tasks to address her parenting, substance use, mental health, housing, and other general duties to maintain stability. The treatment plan instructed that she maintain sobriety, submit to regular testing for substances, and complete a chemical dependency and psychological evaluations. It also tasked Mother with enrolling in individual therapy and completing anger management classes. The treatment plan required that Mother remove all unapproved individuals from the home and inform the Department if any violence or destruction occurred in the home. It explicitly prohibited Cameron from residing with Mother unless he addressed the Department's safety concerns, including chemical dependency, anger management, and criminal behavior. Finally, Mother was expected to maintain regular contact with the Department and sign all necessary releases to enable professionals involved to communicate effectively.

¶8     Mother's engagement with the Department initially was minimal. She was difficult to contact because her phone number frequently changed. She often picked up release of information forms but did not return them to the Department. Despite the Department's recommendations for parenting classes and evaluations, Mother often chose non-approved providers and would not share with the Department the provider's accurate information and vice versa. She had difficulty maintaining sobriety, often having more missed and positive tests than negative tests. She did not complete a Department-approved chemical dependency evaluation until August 2024. Her scheduled visits with W.B.A. were inconsistent to start, with Mother often cancelling. Despite not being permitted, Cameron came to several scheduled visits until A.N. asked that he stop. Although Mother took

parenting classes, the first class she chose was not approved by the Department. She did not complete a Department-approved parenting class until October 2024. The Department also found Cameron and Mother on the jail roster for domestic-violence related charges. Cameron was sentenced to three years of incarceration, which he began serving sometime after July 2024. Mother told the Department that she planned to continue to have a relationship with him, as they were now engaged. As of the termination hearing, Mother had not taken an anger management class.

¶9 Without objection, the court extended temporary legal custody until August 15, 2024. On August 2, 2024, the Department filed a petition to terminate Mother's parental rights.[1] After a three-day evidentiary hearing, the District Court ordered termination of Mother's parental rights and granted the Department permanent legal custody. The court found that Mother's long history with the Department consistently involved the same issues of substance use, mental health issues, unsanitary and unsafe housing, exposure to domestic violence, and allowing unsafe individuals in the home and to care for W.B.A.. The court noted Mother's pattern of being involved in problematic, violent relationships, including with Cameron, who Mother openly described as her soulmate and showed no apparent interest in leaving. The court found that Mother's personality disorders resulted in chronic acting out and seeking attention from authorities.

---

[1] The Department also petitioned to terminate Father's rights. He, however, made no further contact with W.B.A.. Father was summoned by publication, did not engage with the Department, and did not participate in the termination proceedings. The District Court determined under §§ 41-3-609(1)(b), -102(1)(a)(ii), MCA, that Father abandoned W.B.A. and willfully surrendered custody. Father did not appeal.

¶10 The court observed Mother's sporadic engagement with the Department as well as with mental health professionals. It remarked that the two chemical dependency evaluations were conducted without the professionals knowing Mother's full history or collateral information from the Department. The court noted that Mother's progress toward successfully completing her treatment plan often involved spurts of productivity but failed to demonstrate the ability to implement sustained change. The court found that Mother was unable to maintain sobriety, missing or testing positive on most of the administered substance-use tests.

¶11 The court observed that Mother's scheduled visits with W.B.A. often showed her inability to meet his emotional needs and instead burdened W.B.A. with regulating her emotions. The parenting coach did not recommend unsupervised visits at the time of the termination hearing. The court also found that when W.B.A. was first removed from the home he demonstrated a desire to return so long as the house was clean and only Mother lived there. As time progressed, however, he shared that he wished to reside permanently with A.N.. W.B.A.'s CASA also recommended A.N. as a permanent placement. Finally, the court noted that the Department had been involved in 44 months of W.B.A.'s eight-and-a-half years of life, which already had led to significant instability and disruption to his childhood. It found W.B.A.'s best interest to be served by termination.

¶12 The District Court concluded that clear and convincing evidence supported the termination of Mother's parental rights due to chronic, severe neglect,

§§ 41-3-604(1)(d), - 423(2)(a), MCA, and to mother's failure to successfully complete her court-ordered treatment plan, § 41-3-609(1)(f), MCA.

¶13 This Court reviews a district court's termination of parental rights for abuse of discretion. *In re A.L.P.*, 2020 MT 87, ¶ 12, 399 Mont. 504, 461 P.3d 136. A district court abuses its discretion when "it terminates parental rights based on clearly erroneous findings of fact, erroneous conclusions of law, or otherwise acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *In re D.L.L.*, 2025 MT 98, ¶ 6, 421 Mont. 522, 568 P.3d 552 (citation omitted). The appellant bears the burden of proving that the district court erred. *In re D.F.*, 2007 MT 147, ¶ 22, 337 Mont. 461, 161 P.3d 825.

¶14 "A parent's right to the care and custody of their child is a fundamental liberty interest which must be protected by fundamentally fair proceedings." *In re E.Z.C.*, 2013 MT 123, ¶ 21, 370 Mont. 116, 300 P.3d 1174 (citation omitted). To justify termination of the parent-child legal relationship, the Department must establish by clear and convincing evidence that at least one of several statutory criteria is met. Section 41-3-609(1), MCA; *In re T.S.*, 2013 MT 274, ¶ 22, 372 Mont. 79, 310 P.3d 538. Clear and convincing evidence is "definite, clear, and convincing . . . . [and] must be more than a mere preponderance but not beyond a reasonable doubt." *In re E.Z.C.*, ¶ 21 (quotation omitted).

**Consideration of Guardianship over Termination**

¶15 When the Department petitions for termination, the district court may enter an order terminating the parent-child legal relationship if it finds that the "statutory criteria

7

supporting termination" are met. *In re A.B.*, 2020 MT 64, ¶ 38, 399 Mont. 219, 460 P.3d 405 (citing *In re T.S.*, ¶ 30); §§ 41-3-422, -607, -609, MCA. A district court may enter an order appointing a guardian upon petition of the Department or a guardian ad litem. Section 41-3-444(1), MCA. Absent such a petition, "no limitation requires the district court to consider other options prior to terminating parental rights." *In re A.B.*, ¶ 38 (quoting *In re T.S.*, ¶ 30). The statute's permissive language provides the district court with discretion to decide whether to terminate parental rights. *In re A.B.*, ¶ 38 (quotation omitted).

¶16    Mother argues that the District Court *sua sponte* should have considered permanent guardianship before termination of parental rights. She asks us to overturn the holding in *In re T.S.* that once statutory criteria for termination are met, a district court is not required to consider guardianship as a permanent option. ¶ 30. Mother argues that legislation passed since *In re T.S.* shows a fundamental shift in child neglect and abuse statutes that warrants reexamination of our holding there. She adds that the Department indicated early in the case that it "would agree to" a subsidized guardianship and points out that A.A. remains in a permanent guardianship with A.N..

¶17    None of the changes Mother cites in the child abuse and neglect statutes pertain to guardianship or alter the procedural requirement that either the Department or the guardian ad litem petition for a guardianship.[2]    Here, neither the Department nor the CASA

---

[2] Mother also argues that the Department's decision to petition for termination of parental rights over guardianship was reviewable by the District Court as an agency decision. *Cf.* §§ 2-4-315, -704, MCA; *Winchell v. Mont. Dep't Nat. Res. & Conservation*, 1999 MT 11, 293 Mont. 89, 972 P.2d 1132. This argument was not presented to the District Court and will not be addressed here. *In re T.E.*, 2002 MT 195, ¶ 20, 311 Mont. 148, 54 P.3d 38 ("As a general rule, we do not consider an issue presented for the first time on appeal because it is fundamentally unfair

petitioned for a guardianship. Once the Department met its burden of proof for terminating Mother's parental rights, the statutes did not require District Court to consider guardianship on its own initiative. *In re A.B.*, ¶ 38. The District Court did not abuse its discretion.

**Grounds for Termination**

¶18 The District Court concluded both that Mother had subjected W.B.A. to chronic and severe neglect and that Mother had not successfully completed or complied with her treatment plan and the conduct or condition rendering Mother unfit was unlikely to change within a reasonable time. Either ground alone is sufficient to support termination of parental rights. Sections 41-3-609(1)(d), (f), -423(2)(a), MCA.

¶19 Mother argues that she was not allowed reasonable time to complete her treatment plan. She claims that the District Court relied too heavily on the presumption that if the child has been under the State's custody for 15 of the most recent 22 months it is in the best interest of the child to terminate parental rights. *See* § 41-3-604(1), MCA. She argues that the District Court erred because it did not examine the Department's efforts under the new reasonable efforts standard, § 41-3-423(1)(b), MCA (2023 Mont. Laws, ch. 674, § 4), and should have found that the Department did not make "reasonable efforts" to return W.B.A. to her care when it did not involve her adoptive father and when it did not provide a special accommodation to complete her treatment plan due to her mental illnesses.

¶20 The record showed that since 2013, the Department received thirteen reports on Mother's parenting of W.B.A. and A.A., four of which were founded or substantiated.

---

to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider." (quotation omitted)).

9

Consistent through each of these cases, Mother showed a pattern of chronic drug abuse, untreated mental illnesses, the children's exposure to domestic violence, and allowing unsafe individuals in the home. These conditions persisted through the duration of this case.

¶21 Mother acknowledged that she consistently involved herself in abusive relationships, and Cameron was not an exception. Witnesses described Cameron as "caustic" and a "significant barrier" to Mother's ability to successfully parent. Dr. Susan Day, who conducted Mother's psychological evaluation, noted that Mother's interpersonal issues and reliance on men to soothe her loneliness made Mother notably incapable of protecting herself and by consequence unable to protect her children. While W.B.A. was in the Department's custody, both Mother and Cameron were arrested for domestic violence incidents that involved substance use. Mother admitted that Cameron and she were violent towards one another. She also expressed no intention of leaving Cameron, holding out hope that he would maintain sobriety after his incarceration ends.

¶22 Mother could not maintain sobriety throughout the Department's investigation and had shown over the past decade that it hindered her ability to parent. Of the 65 testing opportunities provided between January 2024 and January 2025, Mother missed 22 tests, tested positive for alcohol on 14 tests, was negative for alcohol but positive for kratom or THC on 16, and tested negative on all substances just 13 times.

¶23 Mother's mental illnesses frequently contributed to her substance abuse. Dr. Day diagnosed Mother as similar to "individuals who engage in significant externalization,

acting out behavior . . . . [and have a] history of antisocial behavior." These individuals have difficulty conforming to societal norms and people in positions of authority. They are impulsive and act out when bored. Mother's belief that she had been healed of her mental illnesses led her to stop taking her medication and begin self-medicating with alcohol and other substances. She quit her job and allowed several people to move into her home to pay for living expenses, all leading to the Department removing W.B.A. from the home.

¶24 Partial compliance with a treatment plan is insufficient; complete compliance with the treatment plan is required. *In re A.N.*, 2000 MT 35, ¶ 45, 298 Mont. 237, 995 P.3d 427; *In re D.V.*, 2003 MT 160, ¶ 27, 316 Mont. 282, 70 P.3d 1253. "Well-intentioned efforts toward successful completion of a treatment plan do not demonstrate either completion or the success of the plan." *In re J.W.*, 2001 MT 86, ¶ 17, 305 Mont. 149, 23 P.3d 916 (citation omitted). The parent not only must comply with the treatment plan; the parent also must be successful in resolving the conduct or condition rendering the parent unfit. *In re J.W.*, ¶ 25; *In re R.B.O.*, 277 Mont. 272, 280-81, 921 P.3d 268, 273 (1996).

¶25 The record here contains substantial credible evidence to support the District Court's finding that Mother did not successfully complete her treatment plan despite the Department's interventions and services. Mother has been involved with the Department for over a decade in her parenting of both A.A. and W.B.A.. Despite Department involvement, Mother has not been able to alter her course to make sustainable changes to her conduct for the betterment of herself and her children. When the Department removed

11

W.B.A. in 2022, the court admonished Mother that if she did not begin to prioritize her children and focus on sobriety the Department likely would be involved again. Less than a year later, the Department removed W.B.A. from the home for similar reasons: unsafe people in the home, domestic abuse occurring in front of W.B.A., and mother's mental health and substance issues.

¶26 Only after the Department filed its petition to terminate in August 2024 did Mother begin consistently attending the required classes and therapies, communicating openly and clearly with the Department, showing up consistently for her scheduled visits, and making consistent efforts to remain sober. Mother points to this significant progress, but the District Court concluded that she did not take these steps until 16 to 17 months after the Department's involvement in this case. Mother's initial lack of motivation led to the State's temporary custody of W.B.A. for over 15 of the most recent 22 months, giving rise to the presumption that it is in the best interest of the child to terminate parental rights. *See* § 41-3-604(1), MCA.

¶27 Dr. Day's psychological evaluation and testimony supported the District Court's conclusions. Dr. Day gave Mother an extremely poor prognosis in terms of Mother's ability to parent. She considered Mother's chronic substance use, vulnerability to relapse, and chronic unstable relationship history. Dr. Day determined that for Mother to successfully maintain a safe home environment would require continued therapy, chemical dependency monitoring, and lifestyle supervision. This was somewhat achievable while the Department was involved but unlikely if the Department returned W.B.A. to the home.

12

Dr. Day testified that individuals with similar antisocial personality disorders tend to begin stabilizing or remitting in the fourth or fifth decade of their life. Dr. Day expressed concerns that Mother, at 44, had shown no such signs within the last ten years. She concluded that Mother was likely incapable of being a "safe, consistent caregiver during [W.B.A.'s] childhood." Dr. Day determined that reunification with W.B.A. was not reasonable and that the Department should consider other options.

¶28 Mother recognized that she often chooses partners with substance abuse problems who are domestically abusive, including Cameron. Mother admitted to Dr. Day that she was under the influence of drugs or alcohol for half of W.B.A.'s life. Mother testified that she had doubts about her ability to remain sober and wasn't entirely clear on her intentions with Cameron after his release from incarceration. At trial, Mother observed that she was often unable to apply what she learned from therapy into sustainable practice, something several other witnesses also noted. Assessing whether the conduct or condition rendering a parent unfit is likely to change within a reasonable time requires that the court consider "the past and present conduct of the parent." *In re M.T.*, 2002 MT 174, ¶ 34, 310 Mont. 506, 51 P.3d 1141 (*In re M.T. I*) (citation omitted). Mother's own statements buttressed the District Court's findings that she was unlikely to change within a reasonable time.

¶29 The District Court found that the Department made good faith, reasonable efforts to prevent the necessity of removal of W.B.A. and to reunify Mother and W.B.A. Section 41-3-423(1), MCA. The 2023 changes to the statutory reasonable efforts standard do not alter that reasonable efforts are "not static or determined in a vacuum but dependent on the

13

totality of the circumstances" and "highly fact dependent." *In re M.T.*, 2020 MT 262, ¶ 27, 401 Mont. 518, 474 P.3d 820 (*In re M.T. II*) (internal quotations and citations omitted). Reasonable efforts are not a separate requirement that must be satisfied to terminate parental rights; rather, they may provide predicate findings for a district court's conclusion that the parent is unlikely to change within a reasonable time. *In re M.T. II*, ¶ 27 (citing *In re C.M.*, 2019 MT 227, ¶ 22, 397 Mont. 275, 449 P.3d 806). Overall, the parent "retains ultimate responsibility for complying with the plan." *In re T.D.H.*, 2015 MT 244, ¶ 42, 380 Mont. 401, 356 P.3d 457 (citation omitted); *In re M.T. II*, ¶ 27. The Department is not required to "endlessly pursue an unwilling parent who does not wish to be found with services that the parent does not wish to receive." *In re A.M.G.*, 2022 MT 175, 410 Mont. 25, 517 P.3d 149. The Department's efforts must be reasonable, not "herculean." *In re M.T. II*, ¶ 27.

¶30 The Department attempted to contact Mother by visiting her home, calling her, and texting her. It offered resources and referrals to Mother and Cameron for therapy, chemical dependency and mental health evaluations. It offered to set up drug testing for Mother. The Department placed W.B.A. with A.A.'s grandmother and kept the siblings together throughout the case. The Department provided referrals to parenting plan classes and a parenting coach, arranged for supervised visits in the least restrictive settings, and provided gas vouchers for Mother to attend scheduled visits. The Department asked Mother to sign information requests with several professionals, many of which Mother would pick up and not return or refuse to provide. Given the District Court's long involvement with the family

14

and familiarity with the parties' interactions through the life of the case, we are not inclined to second-guess its determination that the Department's efforts were reasonable.

¶31 Mother has not demonstrated that the Department's failure to have Mother's adoptive father as a visitation supervisor was unreasonable when W.B.A. expressed that he did not want that or that such failure rendered its efforts to facilitate reunification unreasonable. Mother also has not demonstrated that the Department's failure to accommodate for her mental illness was unreasonable. When the Department proposed Mother's treatment plan, Mother did not object based on her mental illnesses or her inability to complete the tasks as outlined in the plan. *In re T.S.*, ¶ 25. Mother relies on a single statement she made at a status hearing held in August 2024 to support this claim. Throughout the case, however, Mother's counsel made no claim that Mother could not succeed in her treatment plan without accommodation, and neither Mother nor counsel made a specific reference to requirements of the Americans with Disabilities Act.

¶32 The District Court found that Mother's failure to provide releases, inconsistent engagement, frequently changing providers, and not working within the Department's recommendations hampered the Department's ability to facilitate the treatment plan. We acknowledge that the record shows miscommunication between the Department and Mother, and the Department could have been more diligent in actively finding the professionals Mother referenced. Mother, however, had "an obligation to avail herself to services arranged or referred by the Department and engage with the Department to successfully complete her treatment plan." *In re D.L.*, 2019 MT 267, ¶ 19, 397 Mont. 507,

452 P.3d 890 (citations omitted). The District Court's findings that Mother was unlikely within a reasonable time to change the conduct or conditions that rendered her unfit were grounded in substantial evidence and were not clearly erroneous.

¶33 When considering the termination of parental rights, "the child's health and safety are of paramount concern." Section 41-3-101(7), MCA. "[T]he best interests of the child . . . take precedence over parental rights." *In re D.H.*, 2001 MT 200, ¶ 32, 306 Mont. 278, 33 P.3d 616 (citation omitted). When conflicting interests are at stake, the district court must "give primary consideration to the physical, mental, and emotional conditions and needs of the child." Section 41-3-609(3), MCA; *In re D.H.*, ¶ 32.

¶34 The District Court found that it was in the best interest of W.B.A. to remain with A.N.. At the time of the termination hearing, W.B.A. had been under the Department's care for nearly four of his eight-and-a-half years of life. He had developed a strong bond with A.N. and remained close with A.A.. While under A.N.'s care, W.B.A. was performing well academically, participating in extracurricular activities, and receiving therapeutic services. At the time of the termination hearing, W.B.A. wanted to permanently reside with A.N.. His CASA advocated that it was in W.B.A.'s best interest not to return to Mother's care and that he remain with A.N..

¶35 The District Court terminated Mother's rights relying on her consistent pattern of behavior and the testimony of Dr. Day that such patterns of drug abuse and her chronic problematic interpersonal relationships were unlikely to change within a reasonable time. It prioritized W.B.A.'s wellbeing and concluded that A.N. was consistently capable of

16

meeting W.B.A.'s needs. Because the District Court did not abuse its discretion when it terminated Mother's rights under § 41-3-609(1)(f), MCA, we affirm its decision on that basis. We do not address Mother's arguments that she did not subject W.B.A. to chronic, severe neglect. *In re S.T.*, 2008 MT 19, ¶ 15, 341 Mont. 176, 176 P.3d 1054 ("[W]here a district court relies on more than one statutory basis in terminating parental rights, any one basis, if correctly relied upon, is sufficient to support termination under § 41-3-609(1), MCA." (citations omitted)).

¶36    We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review. The District Court's order is affirmed.


                                                    /S/ BETH BAKER

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ KATHERINE M BIDEGARAY
/S/ INGRID GUSTAFSON
/S/ JIM RICE