No. 02-436

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 68

IN THE MATTER OF
J.V., S.V., T.V. and M.V.,

Youths in Need of Care.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
                In and for the County of Custer, Cause No. DN 2000-6
                The Honorable Gary L. Day, Judge presiding.

COUNSEL OF RECORD:

          For Appellant:

B.        J. Dennis Corbin, Miles City, Montana (for F.B., natural father of J.V.); J.
of        Wheatcroft, Miles City, Montana (for N.V., mother of the Youths in Need
          Care)

          For Respondent:

          Mike McGrath, Montana Attorney General, Ilka Becker, Assistant Montana
          Attorney General, Helena, Montana; Coleen J. Magera, Custer County
          Attorney, Miles City, Montana; Gary Bunke, Assistant Attorney General,
          Child Protection Unit, Miles City, Montana; Cynthia K. Thornton, Miles City,
          Montana (for E.T., natural father of M.V., S.V. & T.V.)

          Guardian ad Litem:

          Janette Krutzfeldt Jones, Miles City, Montana

                                        Submitted on Briefs:  February 20, 2003

                                                  Decided:  April 3, 2003

Filed:

_____
                    Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     The Sixteenth Judicial District Court, Custer County, terminated the parental rights of the three natural parents of J.V., S.V., T.V. and M.V., and awarded permanent legal custody with the right to consent to adoption to the Montana Department of Health and Human Services (DPHHS). N.V., the mother of the four boys, and F.B., the father of J.V., appeal from the court's Findings of Fact and Conclusions of Law. Termination of parental rights for the father of S.V., T.V. and M.V. is not at issue in this appeal. We restate the issues as follows:

¶2     I. Did the District Court abuse its discretion in terminating N.V.'s parental rights?

¶3     II. Did the District Court abuse its discretion in terminating F.B.'s parental rights?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     On April 11, 2000, DPHHS for the third time petitioned the District Court for temporary legal custody of J.V., S.V., T.V. and M.V. These four children had been removed from the care of their natural mother, N.V., by DPHHS in 1996 and 1998 on the basis of allegations of excessive punishment, non-supervision, inadequate living conditions and inconsistent, chaotic parenting. The same allegations formed the basis for the April 2000 petition for the four boys who, at the time, ranged in age from 2 ½ to 7 ½ years. The parents agreed to grant DPHHS temporary legal custody of the children by stipulation and to follow individual treatment plans. The court granted DPHHS legal custody of the four boys for the following six months. Separate treatment plans for the parents were approved by the court

2

in June 2000.

¶5 In October 2000, DPHHS petitioned to continue temporary legal custody of the children. A second hearing was held in January 2001, and new treatment plans were filed for both N.V. and F.B., which covered the period from January through July 2001. F.B.'s second treatment plan included the participation of his new wife, Joanna, in parenting classes and mental health evaluations.

¶6 At the conclusion of the second treatment plan period, DPHHS petitioned the District Court for permanent legal custody of the four children. Two days of hearings followed, on October 15 and November 27, 2001, during which the parents, social workers and mental health professionals testified regarding the special needs of the children and the parents' respective abilities to provide for those needs. At the time of the termination hearing, the children had lived in foster homes for the previous 20 months. On January 10, 2002, the court filed its Findings of Fact, Conclusions of Law and Order terminating the parental rights of the natural parents of the four boys. N.V. and F.B. filed this consolidated appeal.

**STANDARD OF REVIEW**

¶7 A district court's decision to terminate parental rights is discretionary and we review that decision to determine whether the court abused its discretion. *In re J.W.*, 2001 MT 86, ¶ 7, 305 Mont. 149, ¶ 7, 23 P.3d 916, ¶ 7 (citation omitted). However, a parent's right to the care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures. *In re M.A.E.*, 1999 MT 341, ¶ 18, 297 Mont. 434, ¶ 18, 991 P.2d 972, ¶ 18 (citation omitted). As a result, when determining whether to terminate

3

parental rights, a district court must make specific factual findings in accordance with the requirements set forth in § 41-3-609, MCA. *In re J.W.*, ¶ 7. We review those findings of fact to determine whether they are clearly erroneous. *In re J.W.*, ¶ 7. We review conclusions of law to determine whether the court interpreted the law correctly. *In re M.A.E.*, ¶ 17.

¶8 The district court is bound to give primary consideration to the physical, mental and emotional conditions and needs of the children. *In re J.W.*, ¶ 8 (citing *Matter of C.M.* (1997), 281 Mont. 183, 187, 932 P.2d 1063, 1066). Consequently, the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights. Section 41-3-609(3), MCA; *In re J.W.*, ¶ 8. Moreover, the party seeking to terminate parental rights must demonstrate by clear and convincing evidence that the statutory requirements for termination have been met. *In re M.A.E.*, ¶ 18.

## DISCUSSION

¶9 A district court may terminate parental rights if it finds that the child has been adjudicated a youth in need of care, an appropriate court-approved treatment plan has not been complied with or has not been successful, and the conduct or condition rendering the parents unfit is unlikely to change within a reasonable period of time. Section 41-3-609(1)(f), MCA. In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to

4

give the child adequate parental care.   Section 41-3-609(2), MCA.   Among the factors a court must consider is whether emotional illness, mental illness, or mental deficiency renders a parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time.  Section 41-3-609(2)(a), MCA.

I.

¶10     *Did the District Court abuse its discretion in terminating N.V.'s parental rights?*

¶11     N.V. does not challenge the court's finding that her four sons had been adjudicated youths in need of care.   Instead, she argues that the court erred by finding that she substantially failed to complete her second treatment plan and that she was unlikely to be able to adequately parent her children within a reasonable time.  We address each contention in turn.

*A.  Failure to complete treatment plan*

¶12     The primary goals outlined in N.V.'s second treatment plan were to learn appropriate parenting skills by participating in parenting classes; to improve her relationship with her children by maintaining regular contact with them and attending weekly psychological counseling sessions; to seek gainful employment; and to stabilize the home environment by securing permanent housing.   Although the District Court found that N.V. participated in the court-ordered intensive parenting classes, mental health counseling and supervised visitation,  the court determined that N.V. failed to engage in meaningful visitation with her children; to obtain consistent employment or housing; to address the financial responsibilities which limited her ability to care for her children; and to demonstrate sufficient progress in

5

the treatment of her own physical and mental health needs.

¶13　N.V. counters the District Court's determination that she did not have meaningful visitation with her children and asserts that she made strides during the period of the second treatment plan to change her conduct and the conditions that limited her fitness to parent her children. She claims that she was diligent in her efforts to attend court-ordered classes, supervised visits with the children, counseling sessions and psychological evaluations.

¶14　DPHHS social workers and a county health nurse facilitated visitation between N.V. and her children during the second treatment plan and provided intensive parenting instruction. From April to July 2001, Carol Quale transported the children to the Red Rocks Motel for visits between N.V. and all four children each month and between N.V. and the two older boys twice weekly. Quale testified that N.V.'s interaction with the children was erratic. At times, N.V. exhibited positive interest in her sons and interacted with self-control; at other times, N.V. placed unrealistic demands upon the children and inappropriately criticized them. Public health nurse Alice Kmetz, who provided parenting instruction to N.V., observed that N.V. did not appear to be bonded with her two younger sons and did not interact with any of the children in consistently positive or respectful ways. Cynthia Heidt, a mental health counselor at Eastern Montana Community Mental Health Center, who worked with the two younger boys for a year, reported that four-year-old T.V. did not know his mother. Jodi Braden, a DPHHS community social worker, testified that during visits with their mother the children played Nintendo and had little interaction with N.V. According to Braden, N.V. did not follow through on suggestions that she help the

6

children with schoolwork or engage playfully with the children. Braden testified that N.V. canceled several appointments and failed to show up for others. Although N.V. underwent all requested evaluations, Braden stated that N.V. failed to follow through with the recommendations of counselors and therapists to change her lifestyle. Dr. Dawn Birk, a clinical psychologist who provided individual therapy for the oldest child, J.V., terminated N.V.'s visitation in July 2001, due to the adverse effect contact with his mother had upon the well-being of the child.

¶15 Placement of the boys in foster homes during the period of N.V.'s successive treatment plans disqualified N.V. for welfare cash assistance. At the termination hearing, N.V. testified that she started working in March 2001, as a cashier at Town Pump; took a second job at County Market; and then was employed as a shift manager-in-training at Hardee's restaurant. During the period of her treatment plan, N.V. was evicted from her home for failure to pay the rent. She then moved in with her boyfriend and later leased two rooms at the Red Rock Motel where visitation with the children occurred. LaRae Koenig, the family-based services coordinator assigned to assist N.V. in meeting the goals of obtaining appropriate housing, employment and transportation, testified that N.V.'s inability to rent a house or apartment was not a personal failure and reflected the fact that N.V. lacked the funds to pay market rents and no low-income housing units were available in the Miles City area. After N.V. secured employment, she was able to lease an affordable, two-bedroom house. Carol Quale testified that when N.V. was employed, she seemed overwhelmed and was not able to maintain a regular visitation schedule with the children.

¶16    The District Court determined that N.V. showed little progress in the treatment of her physical and mental health needs during the treatment period. N.V.'s therapist, Patty Lavin, testified that N.V. has been diagnosed with major depression, histrionic personality disorder with dependent features and impulse control disorder. Lavin described N.V.'s typical reaction to stress to be excessive hypervigilence, anger and defensiveness, and characterized N.V.'s life as crisis-driven, triggered by unstable relationships, housing calamities, employment disruption, financial difficulties and medical problems. Although N.V. learned to monitor her depression with medication, Lavin stated that N.V. needs on-going intensive therapy, crisis-counseling and minimal stress or a relapse into depression is likely.

¶17    Clinical psychologist Dr. Ned N. Tranel conducted evaluations of N.V. and the four boys in January 2001. He concluded that N.V. has provided grossly inadequate parenting in the past because she simply was unable to identify and respond to the physical or emotional needs of her children. Tranel reported that all four boys manifest the symptoms of reactive attachment disorder, which now requires intensive therapeutic intervention. In addition to the children's attachment disorders, Tranel testified that J.V. exhibits symptoms of a learning disability and oppositional defiant disorder; S.V. may have attention deficit hyperactivity disorder; T.V. suffers from cognitive disfunction and post-traumatic stress disorder; and M.V. also has post-traumatic stress disorder. Given the children's history of abuse and neglect, Tranel warned that they have limited capacities to withstand the stress of any additional inappropriate parenting. He reiterated that the children need security, stability, structure and support to counter the "parthenogenic parenting" they have

experienced. Tranel explained that children suffering from reactive attachment disorder require empathic attunement over an extended period of time before they are able to form healthy relationships with others. Empathic attunement occurs when a primary caretaker is able to identify and respond to the child's emotional state in the absence of descriptive verbal cues. Tranel testified that as a child grows older, therapeutic intervention to remedy early psychological damage is more difficult. Due to N.V.'s chronic depressive condition, her propensity for minimizing and avoiding problems and her impulsive personality style, Tranel concluded that N.V. was not able to provide a minimal standard of parenting for her four sons and the prognosis for altering her way of life and gaining the emotional maturity to provide adequate parenting was poor.

¶18     The testimony at the termination hearing reveals that N.V. did make significant strides during the second treatment plan period. She effectively addressed her chronic depression with medication and psychological counseling. She also secured gainful employment and located affordable housing. Nevertheless, we conclude that the District Court's finding that financial and psychological problems continue to adversely impact N.V.'s ability to care for her children is not clearly erroneous. Poverty exacerbates the challenges faced by any single parent of four small children. In this case, psychiatric nurse Patty Lavin and clinical psychologist Ned Tranel concurred that N.V. lacks the capacity to provide the level of interactive, attuned parenting demanded by the special needs of each of her four children. The testimony of the community social workers confirms that the pressures of full-time employment combined with N.V.'s relatively fragile mental health status make the demands

9

of parenting insurmountable for N.V. at this time. We conclude that the court did not abuse its discretion in determining that N.V.'s second treatment plan, the goal of which was to create a stable and nurturing home environment for the children, was not successful.

*B. Conduct or condition unlikely to change within a reasonable time*

¶19 Section 41-3-609, MCA, provides, in pertinent part:

(2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making the determinations, the court shall consider but is not limited to the following:

(a) emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;
. . . .

(3) In considering any of the factors in subsection (2) in terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child.

¶20 The District Court's finding that N.V.'s emotional and mental illness that rendered her unable to adequately care for her children was not likely to change within a reasonable time was supported by Dr. Tranel's conclusions that N.V. was not able to provide a minimal standard of parenting and the prognosis for her being able to provide adequate parenting in the future was poor. Patty Lavin, the therapist who diagnosed N.V.'s recurrent depressive disorder, agreed that N.V. required on-going intensive mental health treatment and material support to function on her own. Because J.V., S.V., T.V. and M.V. all have special needs

10

and are not emotionally or physically equipped to tolerate additional abusive or neglectful parenting, we conclude that the District Court was correct to terminate N.V.'s parental rights and grant DPHHS permanent custody of the children with consent to adopt.

II.

¶21     *Did the District Court abuse its discretion in terminating F.B.'s parental rights?*

¶22     F.B. admitted that he abandoned his ten-year-old son J.V. prior to birth and did not contribute to J.V.'s upbringing in any meaningful way before February 2000.  As the father of six children born to four different mothers in Montana, F.B. also admitted that he had not paid child support consistently for any of his off-spring and was at least $30,000 in arrears. During the fall of 1999, F.B. returned to Miles City and cohabited for a few months with N.V. and J.V., and N.V.'s three other children from another relationship.  When relations with N.V. became strained, F.B. moved in with Joanna, a woman in Miles City with whom F.B. had fathered another child eight years earlier.  Joanna is  also the mother of two other children, the younger of whom has cerebral palsy.

¶23     In mid-February 2000,  F.B. agreed to have his son, J.V., who was then 7 ½  years old, stay with him at Joanna's home because N.V. was having great difficulty caring for her children.  Five weeks later, N.V. reclaimed J.V. and refused to return him to the care of F.B. and Joanna.  In mid-April 2000, DPHHS removed all four children from N.V.'s care.

*A.  Failure to complete treatment plan*

¶24     F.B. sought custody of J.V. after he was removed from N.V.'s care.  F.B. stipulated to a six-month treatment plan in June 2000, followed by a second treatment plan covering

the period from January to July 2001. F.B. agreed to complete chemical dependency testing and counseling, attend parenting classes, contact a social worker on a weekly basis and maintain visitation with J.V. in accordance with the recommendations of J.V.'s counselor, Dr. Dawn Birk. F.B. and Joanna married in February 2001, and Joanna joined as a participating partner in the second treatment plan.

¶25 Dr. Birk, a clinical psychologist in Miles City, met with all parties during the course of the successive treatment plans. She diagnosed J.V. as having a major depressive disorder with incidents of enuresis and encopresis. In September 2000, Dr. Birk initiated individual therapy with J.V. She testified that the visitation session between J.V., F.B. and Joanna sent J.V. "into a tailspin and caused him to demonstrate significantly depressive behaviors--and he made suicidal threats, and he had a plan of suicide." Dr. Birk stated that F.B. presented narcissistic, aggressive and sadistic tendencies and recommended that J.V. have no further visitation with him. At the termination hearing, Dr. Birk testified that J.V. did not identify a significant bond with his father or Joanna during his individual therapy. F.B. contends on appeal that Dr. Birk's limitation on visitation with J.V. made the establishment of a healthy relationship between himself and J.V. unattainable within the time frame of the second treatment plan.

¶26 Dr. Tranel evaluated F.B. in February 2001, and concluded that F.B. exhibited indicators for antisocial personality disorder, which would require intensive individual therapy to address. Rochelle Beley, a marriage and family therapist, met with F.B. and Joanna in September 2001, to discuss arranging visitation with J.V. and working toward

12

J.V.'s placement with them. Beley testified that she was concerned about F.B.'s alcoholism and history of relapses into drinking when under stress. She noted that both F.B. and Joanna had histories of short-term relationships and expressed a concern that this couple may not be able to provide the consistency and long-term stability that J.V. needs. Beley testified that J.V. stated he had no recollection of a life with his father and reasoned that J.V.'s interest in living with his father was based in the child's fantasies.

¶27    We conclude that the District Court's determination that F.B. did not comply with his second treatment plan is based on clear and convincing evidence. F.B. did not stop drinking and did not follow through with chemical dependency counseling during the treatment plan period. We join the District Court in recognizing the positive support Joanna has provided F.B., but note that as recently as September 2000, F.B. was arrested for family member assault and, in September 2001, F.B. relapsed into using alcohol in response to stress. All mental health professionals who evaluated F.B. expressed concern about F.B. parenting J.V. due to F.B.'s antisocial personality disorder; his unaddressed alcoholism and high potential for relapse; his inconsistent involvement with his children and prior history of child abandonment; and his lack of attachment with J.V. in particular. F.B. underscored the concerns when he testified that he is an alcoholic and that if he "picks up one shot, I'll have too many." F.B. admitted that he still drinks occasionally and has not maintained sobriety for any substantial length of time.

        *B. Conduct or condition unlikely to change within a reasonable time*

¶28    F.B. claims that the State has not proven by clear and convincing evidence that the

13

conduct or condition that renders him unfit to parent J.V. is unlikely to change within a reasonable time. He asserts that he and Joanna successfully parented his biological child and his two step-children for two years prior to the termination hearing, demonstrating that his antisocial disorder and alcoholism do not preclude him from parenting. Dr. Tranel's conclusion that F.B. will not likely be able to effectively parent J.V. within a reasonable time is logically inconsistent, F.B. argues, with the fact that DPHHS never intervened in regard to his and Joanna's parenting of the other three children.

¶29 We are not persuaded by F.B.'s argument that Joanna's parenting abilities compensate for his unwillingness to address his chemical dependency and the fact that he never established a meaningful relationship with J.V. We conclude that the District Court's determination that the conduct or condition that makes F.B. an unfit parent is unlikely to change within a reasonable time is not clearly erroneous. Dr. Tranel testified that F.B. could address his antisocial personality disorder and chemical dependency through intensive therapy. However, until that process was substantially completed, Dr. Tranel stated that F.B. would not be able to meet a minimal standard of effective parenting. The undisputed testimony at the termination hearing reveals that J.V. needs more than a minimal standard of parenting at this time in his life. Therefore, we conclude that the District Court was correct to terminate F.B.'s parental rights and grant DPHHS permanent legal custody with consent to arrange for J.V.'s adoption by adults who can provide the child with the security, consistent nurturing and empathic parenting he needs to recover from past abuse and neglect.

¶30 Affirmed.

/S/ JAMES C. NELSON

We Concur:


/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ PATRICIA COTTER
/S/ JIM RICE