No. 02-765

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 160

IN THE MATTER OF D.V.,

　　　　Youth in Need of Care.


APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone, Cause No. DN 00-116,
The Honorable Diane G. Barz, Judge presiding.


COUNSEL OF RECORD:

　　　　For Appellant:

　　　　Jill Deann LaRance, LaRance, Syth & Associates, Billings, Montana

　　　　For Respondent:

　　　　Mike McGrath, Montana Attorney General, Tammy K. Plubell, Assistant
Montana Attorney General, Helena, Montana; Dennis Paxinos, Yellowstone
County Attorney, Jeff R. Lynch, Deputy Yellowstone County Attorney,
Billings, Montana; Connie Camino, Billings, Montana (for mother); Danielle
Metcalf, Department of Public Health, Billings, Montana; Damon L. Gannett,
Billings, Montana (for youth); Patrick Kenney, Billings, Montana (Guardian
Ad Litem)


Submitted on Briefs:　　April 17, 2003

Decided:　　June 5, 2003

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1      D.M.V., the biological father of D.V., appeals the Thirteenth Judicial District Court's Order terminating his parental rights.  We affirm.

## ISSUES

¶2      D.M.V. presents four issues on appeal.  Restated, these issues are:

        1.      Did the District Court err when it approved the treatment plan prepared for D.M.V. by the Department of Health and Human Services, Child and Family Services Division (DPHHS or the Department)?

        2.       Did the District Court err when it determined that sufficient evidence existed to show that continuation of the parent-child relationship would be detrimental to the child?

        3.      Did the District Court err when it determined that the statutory requirement for termination of parental rights was met?

        4.      Did the District Court err by determining that the best interests of the minor child would be met by terminating the natural father's parental rights?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3      On November 26, 2000, R.F. gave birth to a baby girl, D.V.  At the time R.F. was fifteen years old and D.V.'s father, D.M.V., was eighteen years old.

¶4      Both of these young parents have extensive histories with DPHHS.  Without recounting all of the troubling details of the Department's involvement in R.F.'s life, we note that as a result of its ongoing relationship with R.F. the Department was notified as soon as D.V. was born.

¶5      On December 4, 2000, DPHHS received a report from the clinic where R.F. and D.M.V. had taken the newborn infant for her one-week exam.  The report noted several

2

concerns in R.F.'s and D.M.V.'s parenting abilities; therefore DPHHS contacted R.F. and arranged a meeting. At the meeting, the DPHHS social worker observed that the parents were not interacting with the child and seemed unable to adequately and safely care for the child. Moreover, D.M.V., who was on probation, appeared to be under the influence of a chemical substance and refused to provide a urinalysis test without being required to do so by his probation officer. DPHHS offered a foster care arrangement for both R.F. and D.V. but R.F. firmly refused.

¶6 On December 8, 2000, DPHHS concluded it was in D.V.'s best interest for the Department to take her into protective custody and emergency care. At that time, the Department petitioned the District Court for Temporary Investigative Authority (TIA) and emergency custody over the child. The District Court granted the petition. Subsequently, DPHHS arranged for monitored visits between the parents and the child.

¶7 In an effort to protect D.V. and to assist this young couple in acquiring the necessary parenting and life skills with which to raise D.V., DPHHS prepared and required that R.F. and D.M.V. sign family and treatment plans, each of which was effective for approximately ninety days. The first of these plans, the family plan, was presented to R.F. and D.M.V. in January 2001. The primary goals of the treatment plans were for each young parent to 1) learn appropriate parenting skills by attending and participating in parenting classes; 2) establish sober lives by addressing alcohol and drug-dependency issues; 3) maintain a regular supervised visitation schedule with D.V.; and 4) attend psychological counseling sessions. Additionally, R.F. was to attend school regularly while D.M.V. was to seek gainful

3

employment and secure permanent housing, thereby establishing a more stable environment in which to care for D.V.

¶8 Between December 2000, when DPHHS took custody of D.V., and February 2001, D.M.V. attended at most seven monitored visits with R.F. and D.V. During these visits D.M.V. was frequently verbally abusive, muttering or yelling profanities and threats, uncooperative, and angry particularly when prompted to hold or feed D.V. correctly. In early February 2001, these angry outbursts led DPHHS to suspend D.M.V.'s visitation rights and require that he successfully complete an anger management program before visiting with D.V. again. D.M.V.'s first individual treatment plan, effective March 6, 2001, specifically identified D.M.V.'s anger as a condition of concern and required that he actively "participate in and successfully complete an Anger Management Program."

¶9 On May 4, 2001, D.M.V. received a three year suspended sentence on charges of felony theft, felony criminal possession of dangerous drugs and misdemeanor criminal possession of dangerous drugs. Between May 4 and May 8, 2001, he violated his probation by testing positive for drug use, was jailed and released, had an automobile accident for which he was responsible and which occurred while he appeared to be under the influence of drugs or alcohol, and was jailed again. In early June D.M.V.'s father bailed him out of jail and D.M.V. attempted to see D.V. but was told by DPHHS that visitation would not be reestablished until he had successfully completed an anger management program. D.M.V. had not yet started such a program. On July 9, D.M.V. was incarcerated in the Yellowstone County jail for another probation violation. In August, he was transferred from the county

4

jail to Montana State Prison (MSP) for his probation violations and his ongoing behavioral problems at the county jail. During this time, his probation officer told the DPHHS social worker that D.M.V. was a danger to the community and to his daughter.

¶10 On September 17, 2001, the District Court issued an Order granting temporary legal custody of D.V. to DPHHS, and requiring that D.M.V. complete anger management classes, as had been required in previous court Orders. This Order also found the D.V. was an "abused, neglected or abandoned child" under Montana Law, and adjudicated D.V. as a "youth in need of care."

¶11 In January 2002, D.M.V.'s probation officer informed DPHHS that D.M.V.'s sentence ran until May 2003, and that he continued to have behavioral problems at MSP.

¶12 On February 1, 2002, Yellowstone County, on behalf of the DPHHS, petitioned the District Court to terminate D.M.V.'s parental rights. The Petition claimed that D.M.V. had failed to comply with his treatment plans and the conduct and concerns rendering him an unfit parent were unlikely to change in a reasonable period of time because they stemmed from D.M.V.'s emotional and mental problems, his history of violent behavior, his known dependency on alcohol or narcotics, and his long-term imprisonment.

¶13 On May 23, 2002, the District Court held a hearing at which the DPHHS social worker on this case and D.M.V. testified. On September 11, 2002, the District Court terminated D.M.V.'s parental rights. D.M.V. filed a timely appeal.

**STANDARD OF REVIEW**

5

¶14    We review a district court's decision to terminate parental rights to determine whether the court abused its discretion. *In re J.V.*, 2003 MT 68, ¶ 7, 314 Mont. 487, ¶ 7, 67 P.3d 242, ¶ 7 (citation omitted). The test for an abuse of discretion is "whether the trial court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice." *In the Matter of K.C.H.*, 2003 MT 125, ¶ 11, 316 Mont. 13, ¶ 11, ___ P.3d ___, ¶ 11 (citation omitted). However, because a parent's right to the care and custody of a child is a fundamental liberty interest, it must be protected by fundamentally fair procedures. *J.V.*, ¶ 7 (citation omitted). To satisfy the relevant statutory requirements for terminating a parent-child relationship, a district court must make specific factual findings. We review those findings of fact to determine whether they are clearly erroneous. Lastly, we review the court's conclusions of law to determine whether the court interpreted the law correctly. *J.V.*, ¶ 7.

¶15    As we stated in *J.V.*, "The district court is bound to give primary consideration to the physical, mental and emotional conditions and needs of the children. (Citation omitted). Consequently, the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights. Section 41-3-609(3), MCA; (citation omitted). Moreover, the party seeking to terminate parental rights must demonstrate by clear and convincing evidence that the statutory requirements for termination have been met." *J.V.*, ¶ 8 (citation omitted).

**DISCUSSION**

6

¶16 To terminate a parent-child relationship, a district court must determine that one of the criteria in § 41-3-609, MCA, exists. *Matter of M.J.W.*, 1998 MT 142, ¶ 16, 289 Mont. 232, ¶ 16, 961 P.2d 105, ¶ 16. The sections of this statute relevant to this case are:

(1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:
. . .

(f) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

(2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making the determinations, the court shall consider but is not limited to the following:

(a) emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;

(b) a history of violent behavior by the parent;

(c) excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child; and

(d) present judicially ordered long-term confinement of the parent.

(3) In considering any of the factors in subsection (2) in terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child.

¶17 D.M.V.'s first and third issues focus on satisfaction of § 41-3-609(1)(f)(i) and (ii), MCA, and may be resolved simultaneously. In his first issue he claims that the District Court erred by approving his last treatment plan because it was "inappropriate." In his third issue, he asserts that the District Court erred in determining that the concerns causing him to be unfit were unlikely to change in a reasonable amount of time. He does not challenge the District Court's adjudication of D.V. as a "youth in need of care" nor does he challenge the court's ruling the he did not comply with his treatment plan.

¶18 D.M.V. argues that while the Department prepared one family plan and three treatment plans for him, the only treatment plan prepared after his daughter was an "adjudicated youth in need of care" was his third and last treatment plan. Therefore, for purposes of determining whether the criteria set forth in § 41-3-609(1)(f)(i) and (ii), MCA, were satisfied, the District Court should have relied exclusively on this treatment plan. He asserts that his last treatment plan was inappropriate because the goals included in the plan did not take into consideration the fact that he was in jail and, as a result, some goals could not be met. He cites specifically the goals of securing legal means of support for his family and finding permanent housing. D.M.V. further maintains that no evidence was presented that his treatment plan was modified to include relevant services and programs in prison. He maintains that the District Court erred when it approved this inappropriate treatment plan. Moreover, he argues that the court was not presented with evidence satisfying § 41-3-

8

609(1)(f)(ii), MCA, *i.e.*, his ability to change his conduct or condition within a reasonable time. As a result of these evidentiary failures, he claims that § 41-3-609(1)(f), MCA, was not satisfied.

¶19    The District Court specifically found that D.M.V.'s treatment plan, effective October 27, 2001, to February 1, 2002, "was appropriately tailored to rehabilitating his parenting skills for the purpose of reuniting this family even though he was incarcerated." The court also found that "[D.M.V.] has failed to make even minimal attempts to complete any of the tasks of their Treatment Plans, and therefore, [D.M.V.] has failed to successfully complete the Plan." Lastly, the District Court found that the testimony demonstrated that D.M.V. was "unwilling, unable or unfit to parent [D.V.], and that that condition was unlikely to change in a reasonable period of time."

¶20    We first look at whether D.M.V.'s treatment plan was inappropriate. Section 41-3-443(2), MCA, lists the mandatory information every treatment plan must contain:

> (a) the identification of the problems or conditions that resulted in the abuse or neglect of a child;
>
> (b) the treatment goals and objectives for each condition or requirement established in the plan. If the child has been removed from the home, the treatment plan must include but is not limited to the conditions or requirements that must be established for the safe return of the child to the family;
>
> (c) the projected time necessary to complete each of the treatment objectives;
>
> (d) the specific treatment objectives that clearly identify the separate roles and responsibilities of all parties addressed in the treatment plan; and

9

(e) the signature of the parent or parents or guardian, unless the plan is ordered by the court.

¶21 In each of D.M.V.'s treatment plans, pursuant to § 41-3-443(2)(a), MCA, DPHHS identified "instability" and "the absence of a consistent and legal means of self and family support" among its concerns relative to D.M.V. Under § 41-3-443(2)(b), MCA, DPHHS <u>must</u> include in all treatment plans goals and objectives to address each concern or condition identified under § 41-3-443(2)(a), MCA. Therefore, the goals and tasks of which D.M.V. complains--obtaining legal employment and a stable residence--are mandatory goals correlated to the concerns DPHHS had vis-à-vis the safety and protection of D.V. Treatment plans, while considering the circumstances of the parent, are designed to address the concerns and needs of the child, not the convenience of the parent. All of D.M.V.'s treatment plans focused on providing a safe, nurturing environment for his daughter and developing minimally adequate parenting skills. We conclude that the inclusion in D.M.V.'s last treatment plan of statutorily-mandated provisions designed to address the Department's concerns for the safety and well-being of D.V. is not inappropriate. Furthermore, we find significance in the fact that all previous treatment plans contained the same goals and D.M.V. failed to complete them while he was not incarcerated.

¶22 D.M.V. does not challenge the court's finding that he failed to successfully complete any of the treatment plans presented by DPHHS but he does challenge the court's termination of his parental rights on the grounds that § 41-3-609(1)(f)(ii), MCA, was not satisfied. Section 41-3-609(1)(f)(ii), MCA, allows termination of parental rights if the conditions or

concerns rendering the parent unfit are unlikely to change in a reasonable period of time. Section 41-3-609(2), MCA, provides criteria for court consideration for determining whether a parent's conduct or condition is likely to be cured in a reasonable period of time or is likely to continue for an extended time. The criteria specifically listed in § 41-3-609(2), MCA, are emotional and mental illness, history of violent behavior, chemical and/or alcohol dependency, and imprisonment. We note that the District Court was presented with substantial and credible evidence of D.M.V.'s ongoing emotional and mental health problems; his history of violent and angry behavior; his untreated chemical and alcohol dependency; and his long-term incarceration. In other words, every statutorily-listed factor to consider was present.

¶23 It is well-established that "in reviewing a district court's findings, . . . we do not consider whether the evidence could support a different finding; nor do we substitute our judgment for that of the fact-finder regarding the weight given to the evidence." *In re L.S.*, 2003 MT 12, ¶ 10, 314 Mont. 42, ¶ 10, 63 P.3d 497, ¶ 10 (citation omitted). We hold, therefore, that the evidence presented to the District Court supports its findings that D.M.V. has failed to complete, or to even adequately pursue completion of, an appropriate treatment plan and that the concerns of D.M.V.'s fitness as a parent are unlikely to change in a reasonable period of time. We conclude the criteria of § 41-3-609(1)(f), MCA, were satisfied.

¶24 While satisfaction of § 41-3-609(1)(f), MCA, provides sufficient grounds for terminating D.M.V.'s parental rights, we note that the District Court offered alternative

11

statutory grounds, as well, *i.e.*, §§ 41-3-609(1)(b) and (e), MCA,--abandonment, and satisfaction of criteria in § 41-3-423(3)(a)-(c), MCA. D.M.V. did not challenge the court's conclusion to terminate his rights under either of these alternative and independent statutory grounds.

¶25   D.M.V.'s second and fourth issues are closely related and can be resolved jointly as well. He claims that the District Court erred in determining that the termination of his rights was in his child's best interests, and that there was a lack of evidence to show that a continuation of the parent-child relationship would be detrimental to D.V. He argues that the child is in a safe environment with her mother, therefore terminating his rights was unnecessary. As a result of D.V.'s safe environment, he asserts that he should be given another opportunity to comply with an appropriate treatment plan and to address the Department's concerns. He maintains that, while incarcerated, he has attended some AA meetings, contacted a prospective employer for whom he may sell cutlery knives if released on parole, and read a book on anger management.

¶26   A court's decision to terminate a parent's legal rights to a child is not a decision made lightly. Every court forced to make this decision heavily considers what is in the child's best interests. We have recognized on numerous previous occasions that "[i]n determining whether to terminate parental rights, 'the district court is bound to give primary consideration to the physical, mental, and emotional conditions and needs of the children,' thus 'the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights.'" *In re E.K.*, 2001 MT 279, ¶ 33, 307 Mont.

12

328, ¶ 33, 37 P.3d 690, ¶ 33 (citation omitted). "We will presume that a district court's decision is correct and will not disturb it on appeal unless there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion." *E.K.*, ¶ 33. We find no such mistake of law or unsupported finding of fact here.

¶27 Lastly, it is a long-standing principle that complete compliance with a treatment plan is required, as opposed to partial compliance or even substantial compliance." *In re N.A.*, 2002 MT 303, 313 Mont. 27, 59 P.3d 1135. And while we congratulate D.M.V.'s actions while incarcerated toward addressing his anger and chemical dependence, such actions are insufficient to prove that he is prepared to be a fit and responsible parent.

¶28 In the case before us, the District Court specifically concluded that a continued relationship with D.M.V. would likely cause D.V. "serious emotional and physical damage." In reaching this conclusion, the court utilized the "best interests of the child" standard in deciding to terminate D.M.V.'s parental rights. Moreover, the criteria set out under various applicable statutes allowing for termination of rights were met. We conclude that the District Court did not abuse its discretion, that its factual findings were supported by substantial credible evidence and that its conclusions of law were correct.

## CONCLUSION

¶29 For the foregoing reasons, we affirm the District Court.

/S/ PATRICIA COTTER

We Concur:

13

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

/S/ JAMES C. NELSON

/S/ JIM REGNIER