No. 03-099

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 254

IN THE MATTER OF A.F. and A.C.,

Youths in Need of Care.


APPEAL FROM:     District Court of the Thirteenth Judicial District,
                 In and for the County of Yellowstone, Cause No. DN 01-001
                 The Honorable Gregory R. Todd, Judge presiding.


COUNSEL OF RECORD:

          For Appellant:

          Connie Camino, Billings, Montana

          For Respondent:

          Mike McGrath, Montana Attorney General, Jennifer Anders, Assistant
          Montana Attorney General, Helena, Montana; Dennis Paxinos, Yellowstone
          County Attorney, Rick Helm, Deputy Yellowstone County Attorney,
          Billings, Montana; Damon L. Gannett, Billings, Montana (Guardian
          Ad Litem); Nancy Wetherelt, Billings, Montana (for father M.C.); Kevin T.
          Sweeney, Billings, Montana (for father D.F.)


                              Submitted on Briefs:  July 2, 2003

                                    Decided:  September 23, 2003

Filed:

          _____
                              Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    S.C. is the biological mother of two minor children, A.F. and A.C.  In October 2002, the Thirteen Judicial District Court, Yellowstone County, terminated S.C.'s parental rights to both children, and awarded permanent custody of the children to the Montana Department of Public Health and Human Services (DPHHS or the Department).  S.C. appeals.  We affirm.

## ISSUES

¶2    A restatement of the issues presented by S.C. follows:

1.    Are the District Court's Findings in support of termination clearly erroneous?

2.    Was there substantial evidence to support the District Court's Findings that S.C. did not successfully complete her treatment plans?

3.    Was there substantial evidence to support the District Court's Findings that the conduct/condition rendering S.C. unfit to parent was unlikely to change within a reasonable time?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    S.C. has long suffered from and been diagnosed with various mental and emotional health conditions, including, but not limited to, attention deficit hyperactivity disorder (ADHD), post-traumatic stress disorder, anxiety disorder, personality disorder (not otherwise specified), major depressive disorder, and borderline personality disorder.  She was hospitalized twice in 1996 in California, one of which followed a suicide attempt.

¶4    A.F. was born in May 1991, while S.C. was married to his father, D.F.  A.C. was born in April 1996, while S.C. was married to his father, M.C.  S.C. is divorced from both men

and is not currently married. In January 2002, D.F. relinquished his parental rights to A.F. D.F.'s rights were officially terminated in the District Court Order issued in the case at bar. D.F. is not a party to this appeal. M.C.'s parental rights are the subject of a separate action.

¶5    The Department first received reports about this family in May 1998. Over the following two years, the Department received numerous reports that were investigated and found to be unsubstantiated. Many calls reported that the children were being seriously neglected and without adult supervision. These reports also concerned S.C.'s mental health and her ability to adequately parent A.F. and A.C. The Department referred S.C. to social service providers in the community and she received services from the Family Support Network (FSN), and other individuals and organizations through December 2000.

¶6    In December 2000, the Billings Police Department was conducting an undercover prostitution investigation at a Billings hotel. On December 27, 2000, evidence obtained in the investigation led police to S.C.'s home, where she agreed to let the police enter her home and, after being advised of her constitutional rights, to answer questions. Upon questioning she stated that she operated a legal escort service. S.C. also indicated that a man, unknown to her, was waiting in her bedroom for one of her employees. She agreed to get him and bring him out to meet the police. Moreover, she stated that her two young sons were watching television in another room. At that time, A.C. was 4 years old and A.F. was 9 years old.

¶7    S.C. allowed the police to search her home. During the search, an officer found records and information that appeared to be consistent with the promotion of prostitution.

S.C. was arrested and asked to provide the name of someone who could care for her children while she was in police custody. Either S.C. refused to provide any names or she was unable to reach anyone by telephone. As a result, the police contacted the Department and a social worker took emergency custody of the children. S.C. was charged with Promoting Prostitution and subsequently pled guilty in Billings Municipal Court.

¶8     This course of events, in conjunction with the previous reports to the Department, led the DPHHS to file a Petition for Emergency Protective Services in January 2001. The DPHHS thereafter prepared three treatment plans for S.C. and assigned numerous social workers to assist S.C. and her sons between January 2001 and October 2002. Additionally, S.C. underwent extensive psychological testing by several medical professionals to discover the extent of her mental and emotional difficulties. She also willingly participated in extensive private and group counseling sessions by various professionals.

¶9     S.C.'s sons experience emotional and mental heath problems similar to those experienced by their mother. A.F. has been diagnosed with Dysthymic Disorder and A.C. has been diagnosed with Reactive Attachment Disorder and Intermittent Explosive Disorder. According to expert witnesses, A.C.'s disorders stem directly from a history of deficient care.

¶10    A hearing on temporary custody was held on May 18, 2001, and June 15, 2001. The District Court adjudicated the children to be youths in need of care and granted temporary legal custody to the Department on June 21, 2001. During this time and for several subsequent months, S.C. had regular supervised visits with A.F. and A.C. where she was expected to use the parenting skills that counselors and therapists were helping her learn and

4

develop. These skills were designed, among other things, to aid S.C. in using consistent and appropriate discipline, maintaining appropriate boundaries for herself and her children, and providing even-handed attention and affection to both children.

¶11 The DPHHS petitioned for permanent legal custody on December 26, 2001. A hearing was held over the course of six days. On October 28, 2002, the District Court entered its Judgment terminating S.C.'s parental rights and awarding permanent custody of A.F. and A.C. to the Department. S.C. appeals.

## STANDARD OF REVIEW

¶12 We review a district court's decision to terminate parental rights to determine whether the court abused its discretion. *In re J.V.*, 2003 MT 68, ¶ 7, 314 Mont. 487, ¶ 7, 67 P.3d 242, ¶ 7 (citation omitted). The test for an abuse of discretion is "whether the trial court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice." *In re D.V.*, 2003 MT 160, ¶ 14, 316 Mont. 282, ¶ 14, 70 P.3d 1253, ¶ 14 (citation omitted). However, because a parent's right to the care and custody of a child is a fundamental liberty interest, it must be protected by fundamentally fair procedures. *D.V.*, ¶ 14. To satisfy the relevant statutory requirements for terminating a parent-child relationship, a district court must make specific factual findings. We review those findings of fact to determine whether they are clearly erroneous. Lastly, we review the court's conclusions of law to determine whether the court interpreted the law correctly. *D.V.*, ¶ 14.

5

¶13    As we stated in *J.V.*, "[t]he district court is bound to give primary consideration to the physical, mental and emotional conditions and needs of the children. Consequently, the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights. Section 41-3-609(3), MCA. Moreover, the party seeking to terminate parental rights must demonstrate by clear and convincing evidence that the statutory requirements for termination have been met." *J.V.*, ¶ 8 (internal case citations omitted).

¶14    We presume that a district court's decision in such a case is correct and will not disturb it on appeal unless there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion. *In re M.T.,* 2002 MT 174, ¶ 22, 310 Mont. 506, ¶ 22, 51 P.3d 1141, ¶ 22 (citation omitted).

## DISCUSSION

¶15    While S.C. presented three separate issues on appeal, we conclude that all of her issues can be resolved simultaneously. Basically, S.C. claims that numerous factual findings by the District Court supporting termination were "clearly erroneous." Additionally, she maintains that the factual findings specific to compliance with her treatment plans and the timing within which her condition may improve were not supported by "substantial evidence."

¶16    As noted above, we review a district court's findings of fact to determine whether they are clearly erroneous. A finding of fact is clearly erroneous if: 1) it is not supported by substantial evidence; 2) the court misapprehended the effect of the evidence, or 3) upon

6

reviewing the record, this Court is left with a definite and firm conviction that a mistake has been made. *M.T.,* ¶ 21 (citation omitted). Because we will review the District Court's findings in the case before us to determine if they are clearly erroneous using this above-recited three-prong test, our analysis will subsume S.C.'s issues concerning "substantial evidence."

¶17 A district court may terminate a parent-child relationship under several different circumstances, including when the court finds that the child is an "adjudicated youth in need of care" and both of the following circumstances exist: (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA; *M.T.*, ¶ 24 (citation omitted).

¶18 S.C. does not challenge the District Court's finding that A.F. and A.C. were adjudicated youths in need of care, nor does she challenge the appropriateness of her three treatment plans. Therefore, to determine whether the District Court correctly terminated her rights, we must ascertain whether clear and convincing evidence was presented that S.C. failed to complete her court-approved treatment plans or that her treatment plans were unsuccessful. Additionally, we must determine whether the evidence supports the court's finding that her condition is unlikely to change within a reasonable time.

¶19 The District Court, in its twenty-two page Findings of Fact, Conclusions of Law and Order, made extensive findings based on the record and evidence presented during the

7

hearing. In its findings, the court summarized the testimony of twelve of the nineteen witnesses. Several psychologists and counselors who have met with and tested S.C. and/or her sons testified on behalf of the Department. Numerous social workers who have been involved heavily in this case testified for the DPHHS as well. Additionally, a few DPHHS social workers, as well as S.C.'s group therapy social worker, her intensive case manager, her psychiatrist and her clinical psychologist testified on her behalf.

¶20 The District Court described the three court-approved treatment plans S.C. was assigned. The first treatment plan covered the period from March 9, 2001, to June 9, 2001. Social Worker Juli Pierce was assigned to S.C. during this time and testified by deposition on August 16, 2001, that S.C. had completed only one goal in her first treatment plan, *i.e.*, resolving her criminal matter. S.C. does not dispute that she did not successfully complete her first treatment plan.

¶21 The second court-approved treatment plan covered the period June 9, 2001, to December 15, 2001. Both the first and second treatment plans required S.C. to establish an emotionally healthy, stable, and consistent lifestyle and a healthy relationship with her children. S.C. maintains that Social Worker Pierce testified in her August 16 deposition that S.C. had completed her second treatment plan. Pierce left her job with the Department and was replaced by Social Worker Metcalf in late August 2001. Metcalf testified that while S.C. completed many of the individual tasks listed in her second treatment plan, the second treatment plan was unsuccessful. Metcalf explained that despite counseling and guidance, S.C. could not consistently apply her parenting skills or utilize good judgment. She also

failed to consistently maintain appropriate boundaries for herself and her children. Metcalf claimed that, as a result, S.C. was unable to establish a stable and consistent lifestyle and a healthy relationship with her sons, a critical goal in all of her treatment plans.

¶22 The third treatment plan covered the period from March 19, 2002, to July 3, 2002. The goals and tasks of the third plan were similar to the first and second plans but contained more specific tasks tailored to address the concerns of the mental health professionals and the community and DPHHS service providers who had been working with S.C. and her children for more than a year. In the third plan, S.C. was required to: 1) improve her mental health status, enabling her to provide the children with a safe environment; 2) increase her parenting abilities; 3) provide a safe environment for her children; 4) establish a stable, legal financial status allowing the children's physical and emotional needs to be met, and; 5) cooperate with and assist the DPHHS in assessing compliance with the plan and evaluating successful progress or further needs in developing necessary parental skills and practices.

¶23 Testimony presented by Social Worker Metcalf, her supervisor, Roxanne Roller, and other services providers demonstrated that S.C. failed to complete several tasks included in the third treatment plan. On the other hand, testimony presented by S.C.'s witnesses indicated that she had completed the majority of the tasks and goals of the third treatment plan. The District Court found that S.C. had failed to successfully complete several tasks in her last treatment plan.

¶24 We have noted on numerous occasions, that it is not this Court's function, on appeal, to reweigh conflicting evidence or substitute our evaluation of the evidence for that of the

district court. *M.T.*, ¶ 29 (citing *In re E.K.*, 2001 MT 279, ¶ 43, 307 Mont, 328, ¶ 43, 37 P.3d 690, ¶ 43). Moreover, we recognize that the District Court had the benefit of observing the demeanor of witnesses and therefore defer to the court's determination of the credibility of those witnesses. *Matter of R.J.W.* (1987), 226 Mont 419, 423, 736 P.2d 110, 112.

¶25 The record supports that S.C. did not comply with all of the tasks and goals of her treatment plans. We have repeatedly held that partial compliance with a treatment plan is insufficient to preclude termination of parental rights. *D.V.*, ¶ 27 (citing *In re N.A.*, 2002 MT 303, 313 Mont. 27, 59 P.3d 1135). Moreover, the relevant statute is written in the disjunctive--a treatment plan has not been complied with *or* has not been successful. Section 41-3-609(1)(f)(i), MCA (emphasis added). We have recognized on several occasions that completing all tasks in a treatment plan does not necessarily mean the plan is "successful." *M.T.*, ¶ 31 (citing *E.K.*, ¶ 42). Based on the record in this case, we conclude that the District Court's finding that S.C. did not comply with her treatment plans was supported by substantial evidence and is not clearly erroneous.

¶26 We now look at the second prong of § 41-3-609(1)(f), MCA,--whether the conduct or condition rendering S.C. unfit or unable to parent her children is likely to change within a reasonable time. Determining whether, and when, such a change may occur requires the court to assess not only the present conduct of the parent but also her past conduct. *M.T.*, ¶ 34. The statute provides the following relevant guidance:

> (2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in

10

continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making the determinations, the court shall consider but is not limited to the following:

> (a) emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;

. . . .

Section 41-3-609(2), MCA.

¶27 Since the DPHHS first became involved with this family, the agency had been concerned about S.C.'s emotional and mental stability and her ability to adequately parent her children in a safe, consistent and nurturing manner. Each treatment plan required S.C. to take the necessary steps to reach the goal of establishing a healthy relationship with her sons and providing a safe home environment for them. While the District Court recognized that S.C. loves her sons and that she attempted to complete the many tasks assigned in her treatment plans, the court nonetheless found that S.C.'s "mental illness is of such a nature as to render her unlikely to care for the on-going physical, mental and emotional needs of the children within a reasonable time."

¶28 S.C. argues that the DPHHS failed to meet its burden of proving this unlikelihood by clear and convincing evidence. She claims that several witnesses testified that she had made progress through therapy and medication, that she would continue to make progress and that her children should be returned to her care. We note, however, that the District Court also heard testimony from several other witnesses that S.C.'s long and significant history of

11

mental and emotional illness adversely impacted her ability to function and to adequately parent her children. S.C. is receiving social security disability because she is unable to work due to the severity of her mental illness. Numerous psychologists testified that the disorders from which S.C. suffers are extremely difficult to treat and require extensive, long-term treatment. Even then, success is often limited. Again, as we stated above, where there are conflicts in the testimony, it is the function of the District Court to resolve them and we will not substitute our judgment for that of the trier of fact as the trial court is in a better position than this Court to resolve such issues. *M.T.*, ¶ 29.

¶29   Given the circumstances of this case and the testimony presented to the District Court, we conclude that the court's finding that the conduct or condition rendering S.C. unable to adequately parent her children would not likely change in a reasonable time was supported by substantial evidence.

¶30   While we note that some of the District Court's factual findings contained errors or misstatements of the facts as presented in hearing testimony, we conclude these errors were harmless in that they did not pertain to the court's ultimate findings regarding S.C.'s treatment plans or the likelihood that her condition would not change within a reasonable time. As indicated above, the District Court may terminate parental rights to an adjudicated youth in need of care if an appropriate treatment plan has not been complied with or has been unsuccessful and if the condition rendering a parent unfit is unlikely to change within a reasonable time. As discussed above, the court's findings pertaining to the statutory requirements for termination were not erroneous.

12

¶31     Accordingly, we hold that the District Court did not abuse its discretion when it terminated S.C.'s parental rights.

## CONCLUSION

¶32     For the foregoing reasons, we affirm the District Court.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JIM RICE
/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON