DA 09-0593

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 47

IN THE MATTER OF J.A.S.,

A Youth in Need of Care.

APPEAL FROM: District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DN 08-051C
Honorable Stewart E. Stadler, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Elizabeth Thomas, PLLC; Missoula, Montana

For Appellee:

Hon. Steve Bullock, Montana Attorney General; Mark Mattioli,
Assistant Attorney General, Helena, Montana

Ed Corrigan, Flathead County Attorney; Katie F. Schulz, Deputy
County Attorney, Kalispell, Montana

Submitted on Briefs: February 23, 2010

Decided: March 16, 2010

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 This is an appeal by M.C., the birth mother of J.A.S., from the September 28, 2008, order of the District Court of the Eleventh Judicial District terminating her parental rights. We affirm.

¶2 The issue on appeal is whether the District Court properly terminated M.C.'s parental rights to J.A.S.

## BACKGROUND

¶3 The State, through the Department of Public Health and Human Services, filed the initial petition for emergency services in December, 2008, when J.A.S. was less than a month old. In late November and early December, 2008, medical and social services providers in Flathead County became aware of the condition of J.A.S. Hospital personnel observed him with unexplained chest and leg bruising, and M.C. failed to bring him for a follow-up examination. Social workers searched for but were unable to find M.C. and J.A.S.

¶4 M.C. brought the baby to the hospital again, where doctors observed chest, abdominal and scrotal bruising. They also found rib factures of varying ages and a fractured right tibia that they determined were not accidentally caused. The baby also had weight loss, frequent vomiting and feeding problems. M.C. admitted to using drugs during the pregnancy, and to using cocaine, marijuana and methamphetamine. M.C. reported her suspicion that her boyfriend Roy may have injured the baby although she later shifted the blame to her stepmother. M.C. has failed to successfully identify the

2

father of J.A.S., and several possibilities she named were ruled out through DNA testing. When the suspected child abuse was reported to the sheriff's office, officers discovered that M.C. had an outstanding arrest warrant from Texas for robbery. M.C. was arrested for extradition to Texas and J.A.S. was placed in foster care when he was only a month old.

¶5      M.C. had a history of child care problems in Montana going back to 2005 because she exposed her two older children to domestic violence and drug use. On two occasions when social services providers got involved to investigate the condition of the children, M.C. left the state. Social workers working with J.A.S. in Montana learned that M.C.'s two prior children were removed from her in Texas because of her drug use. She was extradited to Texas where she was placed on probation for the robbery conviction. She then committed another felony involving a stolen credit card and in March, 2009, was sentenced to prison in Texas for two years.

¶6      In May, 2009 the State filed a petition for termination of parental rights because of M.C.'s long term incarceration and the needs of the baby. The District Court held a hearing on the petition in September, 2009, receiving testimony from Sue Kates, the social worker who had been working on the case of J.A.S. Kates testified as to M.C.'s criminal history and history of social services involvement with her children. She described the baby's myriad injuries and health issues arising from neglect, poor care and deliberate abuse. She described the baby's significant improvement and weight gain since living with foster parents who want to adopt him. She testified that the baby had bonded with the foster parents and that it would be detrimental to his psychological and

3

emotional health to be removed from them in several years after M.C. is released from prison.

¶7 M.C. testified from Texas, blaming her stepmother for the injuries to the baby. She also proposed various scenarios, one of which required enactment of new legislation in Texas, under which she might obtain early release from prison. She admitted that she had not completed addiction and parenting classes required by her prior deferred sentence and that she committed a second felony while on probation. She proposed that a purported husband in Texas could drive the older children to Montana to see her, but she admitted that he had not even brought them to visit her in Texas.

¶8 The District Court found that J.A.S. would be over two years old when M.C. gets out of jail in Texas, and that even if she were finally able to straighten out her life after release and complete a treatment plan, it would take another year or two before she would be in a position to have the child returned to her care. M.C.'s history with child protective services agencies in Montana and Texas arose from her mental health issues, including depression, failure to take medication and suicidal ideation. M.C.'s children were removed from her care in both states because of her drug use, the failure of the children to grow and thrive, and exposure of the children to domestic violence. She has a history of drug use involving cocaine, methamphetamine, and marijuana in addition to alcohol abuse.

¶9 The District Court found that the baby deserved permanency and that M.C. had not shown any likelihood that she could provide the care he or her other children needed. The many services and efforts made by the State to safeguard the health of the baby and

4

to allow M.C. to continue to have custody had not eliminated the necessity of intervention. Considering M.C.'s history of substance abuse, her failure to participate in ordered treatment, her continued criminal conduct, and her long-term imprisonment, the District Court found that the conditions that rendered her unfit were unlikely to change in a reasonable time.

¶10 The District terminated the parent-child legal relationship between M.C. and J.A.S. and awarded permanent legal custody of J.A.S. to the Department of Public Health and Human Services with the right to consent to adoption.

## STANDARD OF REVIEW

¶11 This Court reviews a district court's order terminating parental rights for abuse of discretion, *In the Matter of J.V.*, 2003 MT 68, ¶ 7, 314 Mont. 487, 67 P.3d 242. The district court is required to give primary consideration to the physical, mental and emotional needs of the child. *Matter of J.V.*, ¶ 8.

## DISCUSSION

¶12 The primary issue on appeal is whether the District Court could order the termination of M.C.'s parental rights without first providing her with the opportunity to complete a treatment plan. The State's Petition for Termination of Parental Rights was based upon § 41-3-609(1)(f) and (4), MCA. Subsection (1)(f) empowers a district court to order termination of parental rights if the child is adjudicated as a youth in need of care, if an appropriate treatment plan has not been complied with or has not been successful, and if the conduct or condition of the parent rending her unfit is unlikely to change within a reasonable time. Subsection (4)(c) provides that a treatment plan is not

required if the parent "is or will be incarcerated for more than 1 year and reunification of the child with the parent is not in the best interests of the child because of the child's circumstances, including placement options, age, and developmental, cognitive and psychological needs. . . ." A treatment plan is an agreement or court order that specifies the actions a parent must take to resolve the conditions that resulted in the need for protective services for the child. Section 41-3-102(30), MCA.

¶13 The District Court found in this case that M.C. would be incarcerated for more than one year, and that reunification with J.A.S. was not in the child's best interest because of the abuse he suffered, his unmet needs as an infant, and the likelihood that continuation of the parent-child relationship could result in continued abuse or neglect. The District Court found that M.C.'s conduct that threatened the health and safety of J.A.S. was not likely to change in a reasonable time because of her history of substance abuse, her failure to participate in treatment, her continuing criminal activity, her history of domestic violence and her incarceration.

¶14 The District Court properly applied § 41-3-609, MCA, to determine whether to terminate M.C.'s parental rights in this case. Under subsection (1)(f) of that statute, J.A.S. had been adjudicated a Youth in Need of Care on December 23, 2008. While M.C. was never subject to a treatment plan, subsection (4)(c) clearly provides that parental rights may be terminated without implementation of a treatment plan if the parent is or will be incarcerated for more than a year and reunification is not in the best interests of the child. *In the Matter of A.N.W.*, 2006 MT 42, ¶ 55, 331 Mont. 208, 130 P.3d 619. Therefore, since M.C. was incarcerated for more than a year, there was no

6

requirement that a treatment plan be implemented prior to termination of her parental rights.

¶15 It is also clear that even though there was no treatment plan, the State made reasonable efforts to avoid permanent removal of the baby from M.C.'s custody. J.A.S. was in clear immediate physical danger when he was brought to the hospital suffering from neglect and with significant inflicted physical injuries including broken bones. M.C. was soon thereafter returned to face charges in Texas, where she committed another felony leading to her current long-term incarceration. The State meanwhile was working to determine the best and safest future for the very young child. A potential placement with a family member of M.C. was ruled out when the family member failed a drug test. Placement with the child's father was ruled out when DNA testing showed that none of the men identified by M.C. could have been the father of the child.

¶16 The paramount best interests of the baby required that he be placed in a stable and caring home. M.C.'s best plan was that she would complete her Texas jail term, transfer her probation supervision to Montana, take the bus back to Montana, live with relatives while working and saving money, successfully complete a treatment plan, and then be in a position to regain custody of J.A.S. Even if that plan worked completely and without any delays, J.A.S. would be two to three years old before M.C. would be able to seek re-unification. At that point J.A.S. would have to be removed from the only home and foster parents he had ever known.

¶17 In addition, M.C.'s plan does not account for her two other children who now live in Texas or how she planned to care for or even relate to them. As the District Court explained:

> The Court has given primary consideration to the physical, mental and emotional conditions and needs of the child. JAS is not even a year old. He deserves permanency and 16 months is much too long for a child to wait for his parent to return to see if she is even able to care for him. MC has not shown she can parent her older two children and has established no viable plan to provide for them upon her release or how she could care for all her children as is her stated intention.

The State succeeded in placing J.A.S. in a foster family where his life turned around and he is thriving. His future is promising and he has escaped the egregious abuse and neglect that he suffered in the short month that he was in the custody of M.C.

¶18 Therefore, under § 41-3-609(4)(c), MCA, it is clear that reunification with M.C. is not in the best interest of the child, considering placement options, his age, and his developmental, cognitive and psychological needs.

¶19 The decision of the District Court is affirmed.

/S/ MIKE McGRATH

We concur:

/S/ MICHAEL E WHEAT
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JIM RICE